163 F.3d 684
 78 Fair Empl.Prac.Cas. (BNA) 882
 Valerie A. HAWKINS, Plaintiff-Appellant-Cross-Appellee,
v.
1115 LEGAL SERVICE CARE and Charles F. Hamilton, Esq.,
individually and in his capacity as Managing
Attorney for 1115 Legal Service Care,
Defendants-Appellees-Cross-Appellants,
and
Joseph F. Lipofsky, Esq., individually and in his capacity
as Director of 1115 Legal Service Care, Defendant.
 Docket Nos. 97-7280, 97-7309.
 United States Court of Appeals,
Second Circuit.
 Argued April 16, 1998.
Decided Dec. 7, 1998.
 
 Valerie A. Hawkins, Hempstead, New York, Plaintiff-Appellant-Cross-Appellee pro se.
 Lauren Reiter Brody, New York, New York (Rosenman & Colin, New York, New York, on the brief), for Defendants-Appellees-Cross-Appellants.
 Before: KEARSE and MAGILL*, Circuit Judges, and HALL**, District Judge.***
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Valerie A. Hawkins appeals from so much of a judgment and posttrial order entered in the United States District Court for the Eastern District of New York following a combined bench and jury trial before Charles R. Wolle, Judge[1], as (1) dismissed her claim that defendant 1115 Legal Service Care ("LSC") denied her a promotion on the basis of race or gender, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. (1994); (2) reduced to $50,000, pursuant to 42 U.S.C. § 1981a(b)(3)(A) (1994), the jury's award of $1,250,000 in compensatory and punitive damages against LSC and defendant Charles F. Hamilton (collectively "defendants") for discharge of Hawkins in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"); and (3) denied Hawkins an award of attorney's fees pursuant to 42 U.S.C. § 1988 (1994) for stages of the action in which she proceeded pro se. On appeal, Hawkins contends (1) that the district court erred in dismissing her Title VII failure-to-promote claim because defendants' explanation for that failure was pretextual, entitling her to judgment as a matter of law; (2) that the court misapplied the law in reducing the jury's damages award because her retaliation claim was brought under, inter alia, 42 U.S.C. § 1981 (1994), which, unlike § 1981a(b)(3), does not place a ceiling on damages; and (3) that special circumstances warranted an award of attorney's fees to her for her own time spent in pursuing her claims after her original attorney was disbarred. LSC and Hamilton cross-appeal from so much of the judgment and posttrial order as denied their motion to set aside the jury's award to Hawkins of $125,000 in backpay, contending (a) that Hawkins did not reasonably mitigate her damages, and (b) that Hawkins engaged in conduct that, if known to LSC, would have warranted her discharge, and hence limited the period for which LSC was liable for backpay. We affirm in all respects.
 
 I. BACKGROUND
 
 2
 Many of the facts were stipulated prior to trial.
 
 A. Hawkins's Employment at LSC
 
 3
 At all pertinent times, LSC was an entity associated with a labor union of nursing home and hospital workers. Funded by employer contributions, LSC rendered prepaid legal services to members of the union. In 1987, LSC had four offices: one in New York City and three in the Long Island villages of Lawrence, Hauppauge, and Westbury. Westbury was the largest of the Long Island offices.
 
 
 4
 Hawkins, an African-American woman, graduated from law school in 1982 and was admitted to the New York State bar in 1983. She began employment with LSC as a staff attorney in January 1987 and was assigned to the Westbury office, where she handled cases in a variety of areas including landlord-tenant, wills, trusts, probate, Social Security, patient abuse, and consumer law.
 
 
 5
 Shortly after Hawkins was hired, Joseph Lipofsky became LSC's Legal Director. Lipofsky appointed Hamilton to be Managing Attorney for LSC's Long Island offices and assigned him to the Westbury office, where he became Hawkins's direct supervisor. In the spring of 1990, the Westbury office, including both Hamilton and Hawkins, was relocated to East Meadow, Long Island.
 
 
 6
 Performance evaluations of staff attorneys at LSC took the form of "file reviews," in which a supervising attorney would examine case files in an attempt to monitor and evaluate the staff attorney's handling of her cases. Hamilton first conducted file reviews of Hawkins's work in September 1987 and July 1990. After the 1987 review, he found Hawkins's work to be "adequate" and noted some areas of improvement; but he also identified several performance deficiencies, including failure to maintain organized files and adequate status notes, problems completing work with reasonable dispatch, and difficulty drafting certain documents. Hawkins concurred with this review and believed that it was an "adequate assessment of [her] performance." (Trial Transcript ("Tr.") 48.) Hamilton's report of his 1990 review of Hawkins's files primarily commented on individual cases, but it concluded that many of Hawkins's cases were quite old and required immediate attention.B. The Events of 1991: Failure To Promote
 
 
 7
 In early 1991, LSC was planning to close its New York City and Lawrence offices and consolidate those operations in an office to be opened in Queens, New York. In late January or early February, Lipofsky and Hamilton met with Hawkins and informed her that a Senior Attorney position would be opening at the planned Queens office and that, because of her seniority, Hawkins would have the opportunity to be considered for that position. Hawkins did not express interest in the position during that meeting or in the months that followed. At trial, Lipofsky testified that he did not consider Hawkins for the Queens position because, despite their discussion, Hawkins never expressed any interest. Hawkins testified that she had, in fact, been interested in the Queens position but could not have expressed interest or submitted her name for the position because she did not know when that office would open and because LSC had no formal application process.
 
 
 8
 In May 1991, a memorandum was distributed to LSC's employees announcing that the Senior Attorney position in the Queens office, as well as one in the Hauppauge office, had been filled by other LSC staff members. The appointees were white males who had less seniority at LSC than Hawkins, and Hawkins complained to Hamilton about not having been considered for the positions. Hamilton told Hawkins that she had not been considered because she had never advised anyone of her interest. During that conversation, Hamilton informed Hawkins that the Senior Attorney at LSC's East Meadow office was planning to resign, and he invited Hawkins to apply for that position. A memorandum announcing that opening was subsequently circulated to all of LSC's attorneys in New York, and the position was advertised in the New York Law Journal. Hawkins notified Hamilton and Lipofsky that she wished to be considered for the East Meadow position.
 
 
 9
 During the following week, Hawkins took a previously scheduled vacation, and while she was away, Hamilton conducted a file review of her open cases. His conclusions were summarized in a memorandum dated June 4, 1991. Although Hamilton noted that much of Hawkins's work was "of acceptable quality," his review was highly critical of many aspects of her performance. (Memorandum from Hamilton to Hawkins, dated June 4, 1991, at 2.) Hamilton stated, inter alia, that an unacceptably large number of case files (13) could not be located in Hawkins's file cabinet, in her office, or in her secretary's work area; that many of the files that could be found "exhibit[ed] insufficient file notes, and frighteningly large gaps of time in which no work was done"; and that the "tendency to let files sit, without adequate 'tickling', appears to have resulted in at least one 'statute of limitation's [sic ]' problem! Regardless of whether a statute of limitations was missed, the potential for same is so serious as to be inexcusable." (Id. at 1.) Hamilton concluded that "[t]he major problem is your failure to follow up on many of your cases." (Id. at 2.) He also criticized Hawkins for arriving late for work and for not returning to the office after court appearances, commenting that this pattern was "unacceptable in general and especially so when you have a caseload that is not being processed." (Id.) The memorandum concluded with specific questions and comments on each of several dozen cases, as well as a list of the 13 cases in which the files had not been found.
 
 
 10
 In June 1991, Hawkins met with Lipofsky and Hamilton to discuss the review and stated that she disagreed with Hamilton's June 4 memorandum and intended to prepare a response. In July 1991, Hawkins again met with Lipofsky, who told her that, based on the recent file review, he did not think she was ready for a Senior Attorney position. Shortly thereafter, Hawkins responded to the criticisms of the file review in a July memorandum, giving descriptions of the status of all but two of the cases questioned by Hamilton.
 
 
 11
 In August 1991, Hamilton informed Hawkins that there was no longer an opening for a Senior Attorney in East Meadow because the responsibilities associated with that position had been assigned to the LSC Senior Attorney in Hauppauge. Lipofsky testified that the decision to consolidate the East Meadow and Hauppauge Senior Attorney positions was motivated by financial difficulties experienced by LSC in 1991. The trustees overseeing LSC had instructed Lipofsky to reduce costs, and the consolidation of the two Senior Attorney positions saved some $50,000 to $60,000. Lipofsky testified that he did not consider Hawkins's race or gender in denying her a promotion.
 
 
 12
 In September 1991, Hawkins filed a charge of discrimination with the New York State Division of Human Rights ("DHR") and the EEOC, asserting that LSC had denied her promotions on the basis of her race and gender, in violation of Title VII. LSC became aware of this discrimination charge in late October of 1991, and it formally denied the charge in a December 13, 1991 letter to DHR.
 
 C. Hawkins's Discharge
 
 13
 In October 1991, LSC underwent a change in leadership. Lipofsky resigned as Legal Director, and Hamilton became one of two Co-Legal Directors. In the spring of 1992, while the EEOC charge was pending, Hamilton conducted another review of Hawkins's files. In a memorandum stating his conclusions, Hamilton criticized Hawkins for various failures to follow proper office procedure, such as failing to put files away in order to preserve confidentiality and lessen the likelihood of damage or loss; failing to turn in contemporaneous time records; failing to receive waiting clients reasonably promptly; abruptly rescheduling vacations, thereby causing "havoc with the scheduling of appointments" (Memorandum from Hamilton to Hawkins, dated April 14, 1992, at 3); failing to return to the office after attending court sessions that ended in the early afternoon; failing to list court appointments on the office's master calendar; and failing to return telephone calls from clients and adversaries. Hamilton noted in addition that he believed some of Hawkins's cases were handled inappropriately from a substantive standpoint.
 
 
 14
 After this review, Hamilton, in consultation with his Co-Legal Director, decided to terminate Hawkins's employment. Hamilton informed Hawkins of that decision orally on April 16 and by written notice dated April 21, 1992.
 
 
 15
 In April 1992, the EEOC completed its processing of Hawkins's first EEOC charge and issued Hawkins a right-to-sue letter with respect to her failure-to-promote claim. On April 27, 1992, Hawkins filed a second charge of discrimination against LSC with DHR and the EEOC, asserting that LSC had discharged her because of her race and gender and in retaliation for having filed the earlier EEOC charge. The EEOC sent Hawkins a right-to-sue letter on her discharge claim in December 1992.
 
 D. The Present Case
 
 16
 Hawkins commenced the present action in July 1992 against LSC, Hamilton, and Lipofsky. She was initially represented by counsel. However, her attorney was disbarred in January 1995, and she thereafter proceeded pro se. The complaint, as amended in March 1993 ("complaint"), alleged that Hawkins had been denied promotions in May and August 1991 on the basis of her race and gender and that she had been discharged from employment in 1992 on the basis of her race and her gender and in retaliation for filing a charge of discrimination against LSC, in violation of Title VII and 42 U.S.C. § 1981. The complaint also alleged several state-law torts, including intentional and/or negligent infliction of emotional harm, interference with business opportunity, slander, and defamation.
 
 
 17
 Many of these claims were dismissed prior to trial. Hawkins voluntarily dismissed the retaliation claims against Lipofsky, certain state law claims against all three defendants, and the Title VII claims against Hamilton, see Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir.1995) ("individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"). In addition, partial summary judgment was ordered, David G. Trager, Judge, dismissing all other claims against Lipofsky, the failure-to-promote claims against Hamilton, and all other state-law claims against Hamilton and LSC. Finally, the parties agreed that Hawkins had no cognizable claim under § 1981 for failure to promote or for any other events that occurred prior to the November 21, 1991 effective date of the Civil Rights Act of 1991 ("1991 Act"), see Pub.L. No. 102-166, § 402(a), 105 Stat. 1071, 1099, which, inter alia, expanded the reach of § 1981, see Pub.L. No. 102-166, § 101, 105 Stat. 1071, 1071-72. Thus, the claims remaining for trial were Hawkins's Title VII claims against LSC for (a) race or gender-motivated failure to promote, (b) race or gender-motivated discharge, and (c) retaliatory discharge, and her claims against both LSC and Hamilton for retaliatory discharge in violation of § 1981.
 
 
 18
 The trial of Hawkins's remaining claims was held before Judge Wolle in June 1996. The Title VII claim against LSC for failure to promote was tried to the court because it was based on the events of May and August 1991; the 1991 Act's amendment to Title VII, granting certain plaintiffs a right to trial by jury, see Pub.L. No. 102-166, § 102, 105 Stat. 1071, 1073, did not become effective until November 21, 1991, and did not apply to claims that arose before its effective date, see Landgraf v. USI Film Products, 511 U.S. 244, 286, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). All of Hawkins's claims against LSC and Hamilton with respect to her 1992 discharge were tried to a jury.
 
 
 19
 The jury, instructed generally on the law under Title VII and § 1981, was given a special verdict form containing four questions as to liability and three as to damages. Responding to those questions, the jury found that Hawkins had not "proved, by a preponderance of the evidence, that her" race or gender "was a motivating factor in the defendants' decision to terminate her employment." Special Verdict Form[ ] Questions 1, 2. However, the jury found that Hawkins had proven by a preponderance of the evidence "that her having filed against defendant a charge of discrimination, filed with the United States Equal Employment Opportunity Commission, was a motivating factor in defendants' decision to discharge her from her employment at 1115 Legal Service Care," and that "defendants acted with malice or reckless indifference to her rights in discharging her" from that employment. Id. Questions 3, 4. As to relief, the jury found that Hawkins was entitled to backpay in the amount of $125,000. In addition, the jury found that she was entitled to "damages for economic, emotional and psychological harm, humiliation and embarrassment resulting from the termination of her employment on April 16, 1992, in the amount of $250,000.00," id. Question 6, and punitive damages in the amount of $1,000,000.
 
 
 20
 As to Hawkins's Title VII claim for failure to promote, the district court on July 25, 1996, issued findings of fact and conclusions of law, finding that Hawkins had not proven that LSC's failure to promote her to a Senior Attorney position was motivated by her gender or race. The court found that LSC had shown legitimate, nondiscriminatory reasons for its actions, and that Hawkins had not persuaded the court that those reasons were pretextual. Judgments were entered in accordance with the jury's verdict and the district court's findings.
 
 
 21
 Hawkins and defendants made posttrial motions to have certain aspects of the judgments modified or set aside. LSC and Hamilton, to the extent pertinent here, moved principally for a reduction of the jury's award of compensatory and punitive damages, which totaled $1,250,000, on the ground that Title VII limited such damages against LSC to $50,000. They also moved for a reduction of the $125,000 backpay award on the ground that Hawkins had not sufficiently mitigated her damages. Hawkins opposed any reduction in the award of compensatory and punitive damages, arguing that her retaliation claim had been asserted not only under Title VII but also under § 1981, claims under which are not subject to a damages ceiling. In a Ruling on Post-Trial Motions, dated December 31, 1996 ("Posttrial Ruling"), the district court rejected Hawkins's contention that Title VII's ceiling on damages was not controlling, stating that "[t]he case was not submitted to the jury on a section 1981 theory but rather on a Title VII theory based on the right to trial by jury under the amendments contained in 42 United States Code section 1981a." Posttrial Ruling at 11. The court thus granted defendants' motion to reduce the award of compensatory and punitive damages to $50,000. The court denied defendants' motion to reduce the award of backpay.
 
 
 22
 Hawkins's posttrial motion principally asked the court to set aside its findings of fact and conclusions of law with respect to the failure-to-promote claim and to award attorney's fees. The court denied the motion to alter its findings, and it denied attorney's fees with respect to the period during which Hawkins proceeded pro se. The court awarded her reimbursement for fees she had paid to her original attorney.
 
 
 23
 Following the posttrial rulings, a final amended judgment was entered
 
 
 24
 in favor of the plaintiff, Valerie A. Hawkins, and against the defendants 1115 Legal Service Care and Charles F. Hamilton for back pay in the amount of $125,000.00, with prejudgment interest at the legal rate, and, for compensatory and punitive damages in the amount of $50,000.00.
 
 
 25
 (Amended Judgment dated January 2, 1997, at 2.) These appeals followed, with Hawkins principally challenging the rejection of her claim of discriminatory failure to promote and the reduction of the damages award on her claim of retaliatory discharge, and defendants contending that the district court erred in failing to reduce the award of backpay.
 
 
 26
 We note parenthetically that the final amended judgment, entered following the district court's rulings on the parties' respective posttrial motions, runs not only against LSC but also against Hamilton. The basis for any judgment here against Hamilton is hardly clear to us given (a) the pretrial dismissal of all Title VII and state-law claims against him, (b) the jury's finding that Hawkins failed to prove her claim of discriminatory discharge, and (c) the court's finding that the jury had not been presented with a claim that the discharge constituted retaliation in violation of § 1981. However, no question as to the propriety of the judgment against Hamilton has been presented for our review since he has not appealed except to the extent that he joins with LSC in contending that the award of backpay is unduly large.
 
 II. HAWKINS'S APPEAL
 
 27
 On her appeal, Hawkins pursues her contentions that the district court erred (a) in reducing the damages awarded by the jury, (b) in finding against her on her claim for discriminatory failure to promote, and (c) in denying her attorney's fees for the period in which she represented herself. We find none of these contentions persuasive.
 
 A. Reduction of the Damages Award
 
 28
 Hawkins's primary contention is that the district court erred in reducing the jury's award of compensatory and punitive damages from $1,250,000 to $50,000 pursuant to 42 U.S.C. § 1981a, which in 1991 amended Title VII with respect to available monetary relief. Prior to 1991, Title VII provided only for "equitable" remedies, such as backpay. See, e.g., Landgraf v. USI Film Products, 511 U.S. at 252, 114 S.Ct. 1483. The 1991 Act expanded the monetary remedies available under Title VII by allowing awards of compensatory and punitive damages; but it placed limits on the size of those awards, pegging the limitation to the size of the defendant employer's staff. See Pub.L. No. 102-166, § 102, 105 Stat. at 1073 (codified at 42 U.S.C. § 1981a(b)(3)). Under § 1981a(b)(3), on a claim of intentional discrimination in violation of Title VII, a defendant that employs fewer than 101 employees is not to be held liable for compensatory and punitive damages, combined, totaling more than $50,000. See 42 U.S.C. § 1981a(b)(3)(A). It is undisputed that, at all relevant times, LSC employed fewer than 101 employees.
 
 
 29
 However, Title VII's ceiling on compensatory and punitive damages does not limit the scope of relief available under § 1981, see 42 U.S.C. § 1981a(b)(4), and Hawkins argues that § 1981a(b)(4), rather than § 1981a(b)(3), was controlling because her retaliatory discharge claim was brought not only under Title VII but also under § 1981. The district court rejected this argument, stating as follows:
 
 
 30
 [T]he plaintiff contends that her cause of action arose under 42 United States Code section 1981 and not just under Title VII. But this was not her theory in resisting defendants' summary judgment motion and asserting her own motion for summary judgment that was denied by Judge Trager in pretrial rulings. The case was not submitted to the jury on a section 1981 theory but rather on a Title VII theory based on the right to trial by jury under the amendments contained in 42 United States Code section 1981a.
 
 
 31
 Posttrial Ruling at 11. For the reasons that follow, we conclude that the district court erred in ruling that Hawkins's retaliation claim had not been pursued under § 1981, but we conclude that the error was harmless.
 
 
 32
 1. Submission of the Retaliation Claim Under § 1981
 
 
 33
 In the complaint, Hawkins alleged that she had been discharged in retaliation for filing a charge of discrimination against LSC, and she cited both Title VII and § 1981. We see no indication in the record that she abandoned the § 1981 claim thereafter. It is true, as the district court noted, that in connection with the motion and cross-motion for summary judgment, Hawkins generally mentioned § 1981 only in connection with her claim of "discriminatory" discharge (see, e.g., Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Summary Judgment at 15, 23) because of her "race" (id. at 15). But we cannot agree that the limited references implied that she had abandoned her claim of retaliatory discharge in violation of § 1981. Insofar as the references to § 1981 related to her own cross-motion, the fact that they did not mention retaliation merely indicated that as to her retaliation claim brought under that section she did not seek summary judgment. And Hawkins's failure to mention § 1981 in opposing defendants' motion for summary judgment was not significant since defendants' motion itself sought only partial summary judgment and did not mention § 1981. Aside from seeking dismissal of all claims against Lipofsky and all state-law claims against any defendant, the motion requested only dismissal of the claims against Hamilton in his individual capacity under Title VII. (See Defendants' Notice of Motion for Summary Judgment at 1-2.)
 
 
 34
 Moreover, the proceedings following the granting of partial summary judgment plainly revealed that Hawkins had not abandoned her § 1981 claim. For example, in a subsequent letter to Hawkins prior to trial, defendants' counsel wrote to confirm their mutual understanding that "[y]our Section 1981 claims relate ... to your discharge claim and the alleged retaliatory acts leading to your discharge." (Letter of Gary P. Rothman to Hawkins dated January 9, 1996.) Further, it is noteworthy that, although all of the Title VII and state-law claims against Hamilton had been dismissed or withdrawn prior to trial, he remained a defendant in the case. Since the only other claims against Hamilton were asserted under § 1981, the inference is inescapable that Hawkins's § 1981 claims remained alive. In submitting the case to the jury, the court instructed that Hawkins had claims against both LSC "and Charles Hamilton"; and although the special verdict form used by the court did not ask the jury to specify under which statute it was returning its verdict (an omission that in other circumstances could necessitate a retrial, see, e.g., Gierlinger v. New York State Police, 15 F.3d 32, 34 (2d Cir.1994)), it is clear that the jury was asked to answer liability questions with respect to "defendants" in the plural. Finally, in giving its instructions, the court read to the jury the text not only of Title VII but also of § 1981.
 
 
 35
 Accordingly, we conclude that the district court erred in ruling that the § 1981 claims had not been submitted to the jury and in rejecting Hawkins's contention that her retaliation claim was not subject to a ceiling on that basis. For the reasons discussed in the next section, however, we conclude that the result reached was correct for a more fundamental reason.
 
 
 36
 2. Lack of a Legal Basis for the § 1981 Retaliation Claim
 
 
 37
 Section 1981 provides, to the extent pertinent here, that "[a]ll persons within the jurisdiction of the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Prior to the Supreme Court's decision in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), this Court had ruled that § 1981 provided a cause of action for employees who were terminated in retaliation for engaging in activity protected by § 1981 or for protesting conduct that violated § 1981. See, e.g., Choudhury v. Polytechnic Institute of New York, 735 F.2d 38, 42-43 (2d Cir.1984) (§ 1981 provides right to sue on claim that employer retaliated against employee for filing a complaint of racial discrimination, whether or not the retaliation itself was racially motivated); see also Albert v. Carovano, 851 F.2d 561, 572-73 (2d Cir.1988) (en banc); Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir.1988); DeMatteis v. Eastman Kodak Co., 511 F.2d 306, 312 (2d Cir.) (white person, punished for attempting to vindicate rights of racial minorities, has standing to sue under § 1981), modified on other grounds, 520 F.2d 409 (1975).
 
 
 38
 In Patterson, the Supreme Court held that the "make and enforce contracts" language of § 1981 encompassed discrimination in contract formation but not contract performance. See 491 U.S. at 179, 109 S.Ct. 2363; Butts v. City of New York Department of Housing, 990 F.2d 1397, 1404 (2d Cir.1993). Thus, under Patterson, a claim of discrimination in the denial of a promotion was "actionable under § 1981 [o]nly where the promotion [would have risen] to the level of an opportunity for a new and distinct relation between the employee and the employer." Butts v. City of New York Department of Housing, 990 F.2d at 1411 (quoting Patterson, 491 U.S. at 185, 109 S.Ct. 2363). In addition, after Patterson several courts concluded that retaliatory discharge claims, which involved conduct subsequent to contract formation, were not actionable under § 1981. See, e.g., Carter v. South Central Bell, 912 F.2d 832, 840-41 (5th Cir.1990); Sherman v. Burke Contracting, Inc., 891 F.2d 1527, 1535 & n. 17 (11th Cir.1990), cert. denied, 498 U.S. 943, 111 S.Ct. 353, 112 L.Ed.2d 317 (1990).
 
 
 39
 In response to Patterson, Congress included in the 1991 Act a provision adding a subsection to § 1981, defining the phrase "make and enforce contracts." That subsection states that " 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Legislative history supports the view that this definition was intended to encompass both a race-based failure to promote and retaliation for a complaint of such a failure to promote:
 
 
 40
 The Committee intends this provision to bar all race discrimination in contractual relations. The list set forth in subsection (b) is intended to be illustrative rather than exhaustive. In the context of employment discrimination, for example, this would include, but not be limited to, claims of harassment, discharge, demotion, promotion, transfer, retaliation, and hiring.
 
 
 41
 H.R.Rep. No. 102-40(I), at 92 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 630 (emphasis added). In the aftermath of the 1991 Act, a number of courts have concluded that certain retaliatory discharge claims are actionable under § 1981. See, e.g., Andrews v. Lakeshore Rehabilitation Hospital, 140 F.3d 1405, 1412-13 (11th Cir.1998); Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 259 (8th Cir.1996); Thomas v. Exxon, U.S.A., 943 F.Supp. 751, 762-63 (S.D.Texas 1996), aff'd, 122 F.3d 1067 (5th Cir.1997).
 
 
 42
 We remain of the view, in light of the broad sweep of § 1981(b), that a retaliation claim may be brought under § 1981. However, to be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981. See, e.g., Choudhury v. Polytechnic Institute of New York, 735 F.2d at 43-44 n. 6 ("In our case § 1981 is being used to proscribe retaliation for asserting rights protected by § 1981 itself."); see also Manning v. Metropolitan Life Insurance Co., 127 F.3d 686, 689 n. 1 (8th Cir.1997) (gender-based retaliation not cognizable under § 1981). An act of retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981.
 
 
 43
 In the present case, Hawkins's employment was terminated on April 16, 1992, following her September 1991 filing of an administrative complaint with DHR and the EEOC alleging that she had been denied promotions to Senior Attorney on the basis of her race and gender. However, at the time Hawkins was denied promotions, her denial-of-promotion claim was not actionable under § 1981. Her claim of gender discrimination was plainly outside the scope of § 1981, which deals with discrimination on the basis of race or alienage. And prior to the November 21, 1991 effective date of the 1991 Act, the denial of a promotion of the sort sought by Hawkins, even if the denial was racially motivated, was not cognizable under § 1981 because promotion to the position of Senior Attorney would not have created a new and distinct relationship between Hawkins and LSC. Indeed, "the parties agreed that Ms. Hawkins had no § 1981 claim regarding her promotion claims or for any other claims arising prior to the 1991 amendments to § 1981." (Hawkins brief on appeal at 6.) Accordingly, Hawkins's September 1991 complaint to the administrative agencies that she had been denied promotions did not involve the assertion of a right that was then protected by § 1981. Any retaliation against her for filing that complaint was thus not cognizable under § 1981.
 
 
 44
 We conclude that Hawkins's claim for retaliation in violation of § 1981 should have been dismissed as a matter of law, and that her recovery of damages was sustainable only under Title VII. The district court's application of the damages ceiling was therefore not error.
 
 
 45
 B. The Rejection of Hawkins's Claim for Denial of Promotions
 
 
 46
 Hawkins also contends that the district court erred in failing to find that LSC discriminated on the basis of race or gender in denying her promotions. We see no basis for reversal.
 
 
 47
 To prevail on a denial-of-promotion claim, the plaintiff must, inter alia, prove by a preponderance of the evidence that the failure to promote was actually motivated in whole or in part by unlawful discrimination. See, e.g., Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir.1997); Fisher v. Vassar College, 114 F.3d 1332, 1346-47 (2d Cir.1997) (en banc), cert. denied, --- U.S. ----, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). A trial court's conclusions as to the employer's motivation and the existence of discriminatory intent are findings of fact, see, e.g., Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Pullman-Standard v. Swint, 456 U.S. 273, 289-90, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982); Cornwell v. Robinson, 23 F.3d 694, 706 (2d Cir.1994), and may not be set aside on appeal unless they are clearly erroneous, see, e.g., Fed.R.Civ.P. 52(a); Anderson v. Bessemer City, 470 U.S. at 573, 105 S.Ct. 1504; Cornwell v. Robinson, 23 F.3d at 706. The decision as to whose testimony to credit and as to which of competing inferences to draw is within the province of the trier of fact, and "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. Bessemer City, 470 U.S. at 574, 105 S.Ct. 1504. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 573-74, 105 S.Ct. 1504.
 
 
 48
 The findings challenged here are far from clearly erroneous. Lipofsky testified that he did not appoint Hawkins to the Queens Senior Attorney position because, after he expressly informed Hawkins of the job opening and she did not indicate any interest, he assumed that she was not interested in the position. As to the East Meadow position, Lipofsky testified that he did not promote Hawkins because he eliminated the position in order to reduce LSC's operating costs. The trial court was entitled to credit these explanations, which were supported by the record as a whole. For example, Hawkins acknowledged both that she had been informed of the Queens position and that she had not expressed her interest. Moreover, although Hawkins presented some evidence to cast doubt on the genuineness of LSC's proffered explanations, she produced little to show that LSC or its employees were actually motivated by race or gender. Certainly the evidence in her favor was not so overwhelming as to warrant overturning the trial court's finding that she had not proven such discrimination by a preponderance of the evidence.
 
 C. Denial of Attorney Fees
 
 49
 Although a prevailing plaintiff in a § 1981 or Title VII action is ordinarily entitled to recover reasonable attorney's fees under 42 U.S.C. § 1988 or 42 U.S.C. § 2000e-5(k), respectively, a pro se plaintiff is not allowed to recover attorney's fees for representing herself, even if she is a lawyer. See Kay v. Ehrler, 499 U.S. 432, 435-38, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991) (pro se attorney not entitled to attorney's fees under § 1988); see also Hensley v. Eckerhart, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) (same standards are "generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party' "); Bridges v. Eastman Kodak Co., 102 F.3d 56, 58 n. 1 (2d Cir.1996) (§ 1988 cases are authoritative in Title VII attorney's fees context), cert. denied, 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). In Kay v. Ehrler, the Supreme Court explained the rationale for denying fee awards to attorneys who represent themselves, stating that
 
 
 50
 awards of counsel fees to pro se litigants--even if limited to those who are members of the bar--would create a disincentive to employ counsel whenever such a plaintiff considered himself competent to litigate on his own behalf. The statutory policy of furthering the successful prosecution of meritorious claims is better served by a rule that creates an incentive to retain counsel in every such case.
 
 
 51
 499 U.S. at 438, 111 S.Ct. 1435.
 
 
 52
 Hawkins contends that this principle should not be applied to her because she did not desire to represent herself, or even consider herself competent to do so, and proceeded pro se only out of necessity because her initial counsel was disbarred and she lacked the time and financial resources to seek a new attorney. Her argument is unpersuasive. Lack of desire to proceed without an attorney, and lack of self-confidence, time, and financial resources are common to many civil rights claimants. Further, unlike many pro se claimants, Hawkins had once secured an attorney, indicating that her claim--unlike some others--might readily have been perceived as sufficiently promising to attract new counsel without undue delay. And making an award of attorneys' fees available to a pro se attorney claimant would generally have the undesirable effect of lessening the claimant's incentive to obtain counsel.
 
 
 53
 In sum, we see no principled basis here for disregarding the rule fashioned by the Court in Kay.
 
 III. LSC'S CROSS-APPEAL
 
 54
 On its cross-appeal, LSC challenges the jury's award of $125,000 in backpay, arguing (1) that Hawkins did not take reasonable steps to mitigate her damages after she was discharged from LSC, and (2) that the trial court erred in failing to instruct the jury that the period for which Hawkins was entitled to backpay should end as of such time as the jury found that LSC learned Hawkins had engaged in conduct for which she would have been permissibly discharged. We see no basis for reversal.
 
 A. Mitigation
 
 55
 Defendants contend that they are entitled to judgment as a matter of law reducing Hawkins's backpay award for failure to mitigate her damages (1) during a period in 1992 in which she was not employed, and (2) from January 1994 through the time of trial, during which period she was self-employed. We reject the notion that the evidence presented by Hawkins was insufficient to permit the jury to find that she took reasonable steps in an effort to mitigate her damages.
 
 
 56
 An employee discharged in violation of Title VII has an obligation to attempt to mitigate her damages by using "reasonable diligence in finding other suitable employment." Ford Motor Co. v. Equal Employment Opportunity Commission, 458 U.S. 219, 231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982); see 42 U.S.C. § 2000e-5(g)(1). This obligation is not onerous and does not require her to be successful. See, e.g., Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir.1997). In order to reduce the meritorious claimant's entitlement to backpay, the defendant employer has the burden of demonstrating that she has failed to attempt to mitigate. This burden may be met by establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it. See, e.g., id.; Clarke v. Frank, 960 F.2d 1146, 1152 (2d Cir.1992).
 
 
 57
 The ultimate question "is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment." Pierce v. F.R. Tripler & Co., 955 F.2d 820, 830 (2d Cir.1992). For example, although an unemployed claimant would generally forfeit her right to backpay if she refused a job substantially equivalent to the one she was denied, she "need not go into another line of work, accept a demotion, or take a demeaning position." Ford Motor Co. v. Equal Employment Opportunity Commission, 458 U.S. at 231, 102 S.Ct. 3057. Similarly, a claimant who voluntarily resigned from comparable employment for personal reasons would not have adequately mitigated damages, but "a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment." Equal Employment Opportunity Commission v. Delight Wholesale Co., 973 F.2d 664, 670 (8th Cir.1992). Self-employment, if it is undertaken in good faith and is a reasonable alternative to seeking other comparable employment, may be considered permissible mitigation. See, e.g., Smith v. Great American Restaurants, Inc., 969 F.2d 430, 438 (7th Cir.1992) (jury could conclude that plaintiff's opening of her own restaurant was a reasonable venture); Carden v. Westinghouse Electric Corp., 850 F.2d 996, 1005 (3d Cir.1988) ("[A] self-employed person is 'employed' for the purposes of mitigating damages if establishing a business of his own was a reasonable alternative to finding other comparable employment."). But see Hansard v. Pepsi-Cola Metropolitan Bottling Co., 865 F.2d 1461, 1468 (5th Cir.) (ADEA plaintiff's opening of part-time flea market booth did not constitute self-employment sufficient to satisfy obligation to attempt to mitigate damages), cert. denied, 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989). The question whether an employee has made reasonably diligent efforts is one of fact for the jury. See, e.g., Dailey v. Societe Generale, 108 F.3d at 456-57.
 
 
 58
 In the present case, as the district court found in denying defendants' posttrial motions, defendants did not demonstrate that the jury's backpay award of $125,000 was unsupported by the evidence. Hawkins was fired on April 16, 1992; she began working at the law office of C. Vernon Mason on July 27, 1992. Defendants contend that she should have begun working for Mason immediately upon his offering her a position, a few weeks after she was fired by LSC. The evidence showed that Hawkins accepted Mason's offer but scheduled her starting date for early July. That date was then delayed until July 27 by the death of Hawkins's mother. The interval was hardly so long as to be unreasonable as a matter of law. Further, as the district court noted, Hawkins's
 
 
 59
 work for Mason involved longer hours, fewer fringe benefits, and more stressful work than she was performing before defendants terminated her employment. A person need only make reasonable efforts to mitigate damages by seeking substantially comparable employment. The jury could reasonably conclude that plaintiff acted appropriately and reasonably in taking some time for herself to obtain a satisfactory position after she was unlawfully terminated. The jury could also reasonably conclude that she made appropriate efforts to earn money as a self-employed lawyer after finding the working conditions with Mason unsatisfactory. A victim of discrimination may seek income through self-employment as a reasonable alternative to finding substantially equivalent employment.
 
 
 60
 Posttrial Ruling at 8-9. We see no error in these rulings.
 
 B. Dischargeable Wrongdoing
 
 61
 An employer's discovery, after its discriminatory or retaliatory discharge of an employee, that the employee had engaged in conduct that would have led to a lawful discharge if the employer had been aware of that conduct, may limit the employee's backpay award to the period between the unlawful termination and the date on which the discovery was actually made. See, e.g., McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 362, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995); Vichare v. AMBAC Inc., 106 F.3d 457, 468 (2d Cir.1996); Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 124 (2d Cir.1996), cert. denied, 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997). LSC argues that the jury should have been instructed that the period for which Hawkins was entitled to backpay ended as of the date LSC discovered--"shortly before trial commenced," according to Hamilton (Tr. 242)--that Hawkins had violated LSC's written policy forbidding its attorneys to engage in the practice of law other than for LSC. This contention has not been preserved for appeal.
 
 
 62
 Although LSC states that it "sought a jury instruction ... to cut off back pay" as of the date it learned that Hawkins had violated LSC's policy (LSC brief on appeal at 68), we have found no such request in the record. At the only page of the transcript to which LSC cites to support its assertion that it requested such an instruction on backpay, its counsel asked the court to instruct the jury that if it found "that plaintiff committed an act of wrongdoing before her discharge which alone would have resulted in her discharge had the employer known about it while she was employed," then the jury should make "[n]o award of future damages." (Tr. 485 (emphasis added).) We conclude that defendants' present contention with regard to backpay was not presented to the district court, and we see no good reason to overlook that failure.
 
 CONCLUSION
 
 63
 We have considered all of the parties' contentions that are properly before us on these appeals, and have found in them no basis for reversal. The judgment of the district court is affirmed.
 
 
 64
 Each side shall bear its own costs on these appeals.
 
 
 
 *
 Honorable Frank J. Magill, of the United States Court of Appeals for the Eighth Circuit, sitting by designation
 
 
 **
 Honorable Janet C. Hall, of the United States District Court for the District of Connecticut, sitting by designation
 
 
 ***
 Pursuant to 28 U.S.C. § 46(b) and an order of the Chief Judge of this Court certifying a judicial emergency, this case was heard by an emergency panel consisting of one judge of this Court and two judges of other courts sitting by designation
 
 
 [1]
 Of the United States District Court for the Southern District of Iowa, sitting by designation