NEW HAVEN FIREFIGHTERS
LOCAL 825, Plaintiff,

v.

CITY OF NEW HAVEN, Toni Harp,
Michael Briscoe, Eldron Morrison,
and Daniel Delprete, Defendants.

Civil Action No. 3:14-cv-716 (CSH).

United States District Court,
D. Connecticut.

Signed Aug. 7, 2015.

Patricia Anne Cofrancesco, Law Office of Patricia A. Cofrancesco, East Haven, CT, for Plaintiff.

Barbara L. Cox, Office of Corporation Counsel, David N. Rosen, David Hunter Smith, David N. Rosen & Associates, P.C., New Haven, CT, for Defendants.

### RULING ON PLAINTIFF'S MOTION TO REMAND REMOVED ACTION TO STATE COURT

HAIGHT, Senior District Judge:

Michael Briscoe, a co-Defendant, removed this case to this Court pursuant to 28 U.S.C. § 1443(1). Plaintiff now moves to remand the action to its original forum,

the Connecticut Superior Court, Judicial District of New Haven. The motion to remand [Doc. 16], which Briscoe opposes, has been extensively briefed and ably argued by counsel at a hearing before the Court. This Ruling resolves the motion.

### I

This case is one of a prolonged series of actions between Michael Briscoe, an African–American firefighter with the City of New Haven, Connecticut Fire Department on the one side, and on the other, New Haven Firefighters Local 825 ("Local 825" or "the Union"), of which Briscoe is a member and whose officers are Caucasian.

### A

The seeds of controversy were planted when in November and December 2003 the Fire Department administered written and oral examinations for promotion to the ranks of lieutenant and captain.[1] Under the contract between the City and Local 825, the written examination result counted for 60% of an applicant's total score and the oral exam for 40%. Those with a total score above 70% on the exam would pass.

In 2003, there were 8 vacancies for the rank of lieutenant. The City utilized oral and written examinations fashioned and administered by an outside professional consultant. Promotions were made in accordance with lists drawn up to reflect the examination scores and certified by the City.

Seventy-seven candidates completed the 2003 lieutenant examination—43 whites, 19 blacks, and 15 Hispanics. Under the City Charter's "rule of three," the hiring authority was required to fill each vacancy by choosing one candidate from the top

---

1. The facts recited in the first paragraphs of text are adopted from the opinions in *Ricci v. DeStefano*, 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009), and *Briscoe v. City of New Haven*, 967 F.Supp.2d 563 (D.Conn. 2013).

three scorers on the list. The application of the rule of three to the examination scores resulted in the top 10 candidates being eligible for immediate promotion to lieutenant (only 8 would be chosen). All 10 were white. When the examination results showed that white candidates had outperformed minority candidates, City officials became concerned about the City's potential liability for disparate impact under federal antidiscrimination statutes if it certified the 2003 exam results and made promotions on the basis of them. After a hearing on the subject, the New Haven Civil Service Board, as the result of an evenly divided vote, declined to certify the promotion lists generated and threw out the examinations.

Certain white and Hispanic firefighters who likely would have been promoted based on their good examination performances sued the City and some of its officials, alleging that by discarding the exam results, the City discriminated against them based on their race, in violation of Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Fourteenth Amendment. *See Ricci v. DeStefano,* 557 U.S. 557, 129 S.Ct. 2658, 174 L.Ed.2d 490 (2009). The Supreme Court held that the *Ricci* plaintiffs were entitled to summary judgment on their Title VII claim, and remanded the case. Later in 2009, the City certified the 2003 examination results and made promotions accordingly.

Because the 2009 promotions to lieutenant were based on the 2003 examination scores, in which white firefighter candidates scored better than black candidates, Briscoe was not promoted. He responded by bringing an action in this Court against the City under Title VII on a disparate impact theory. *See Briscoe v. City of New Haven,* No. 3:09–cv–1642. This Court dismissed the action on the ground that

"[w]hat the [Supreme] Court held in *Ricci* and what it said in doing so squarely forecloses Briscoe's claims." 2010 WL 2794212, at *10 (D.Conn. July 12, 2010). On Briscoe's appeal, the Second Circuit took a different view and reversed. The Court of Appeals, "[a]fter a careful review of that [*Ricci*] decision and relevant nonparty preclusion and Title VII case law," concluded that "Briscoe's claim is neither precluded nor properly dismissed." 654 F.3d 200, 209 (2d Cir.2011). This Court's dismissal of Briscoe's claim was vacated and the case remanded, the Second Circuit noting that "we express no view as to whether other issues raised below may warrant dismissal of the action, including relevant statutes of limitation, the doctrine of laches, or the unavailability of the requested relief because of Title VII's anti-alteration provision." 654 F.3d at 210.

On remand to this Court in No. 3:09–cv–1642, the City moved again, on those additional different grounds, to dismiss Briscoe's action. The City was joined in that motion by certain white firefighters who sought and obtained the Court's leave to intervene. Additional briefs were filed and renewed oral arguments heard. In an opinion reported at 967 F.Supp.2d 563 (D.Conn.2013), this Court again dismissed Briscoe's action against the City. This Court held that the action, "while not time barred, must be dismissed on substantive grounds," specifically, "that the Plaintiff in this case has not pleaded a prima facie Title VII claim." *Id.* at 592, 590.

This Court filed that second judgment of dismissal on September 9, 2013. Briscoe filed another notice of appeal with the Second Circuit. On March 31, 2014, while the appeal was pending, Briscoe and the City settled Briscoe's underlying discrimination claim. The City paid an agreed amount to Briscoe. Briscoe stipulated to a withdrawal of his appeal, the Second Cir-

cuit issuing its mandate on April 4, 2014. He also withdrew his motion to intervene in a separate action, brought by other black firefighters against the City and Local 825 to challenge the 2003 examination, pending before Judge Underhill: *Tinney v. New Haven*, No. 3:11–cv–1546.

The settlement agreement between Briscoe and the City which terminated the case bearing docket number 3:09–cv–1642 was preceded and brought about by discussions between Briscoe and New Haven Mayor Toni Harp, which culminated in April 2014 when Mayor Harp, purporting to act under the City Charter, transferred Briscoe from his position of firefighter to that of Director of Public Safety Communications. The New Haven Department of Public Safety Communications is the agency responsible for dispatching 911 calls throughout the City. Briscoe entered duty as its Director on April 7, 2014. Briscoe's occupation of that position is regarded initially as a temporary assignment through October 15, 2015, after which it may be made a permanent appointment, that being the date when Briscoe becomes eligible to retire from the Fire Department.[2]

**B**

Briscoe began his service as Director of the Department of Public Safety Communications on April 7, 2014. On April 10, 2014, Local 825 filed a complaint in the Connecticut Superior Court, Judicial District of New Haven, against the City of New Haven, Mayor Harp, and Briscoe. *See Briscoe v. City of New Haven*, No. NNH–CV14–6046320–S (Conn.Super.2014).

Local 825's complaint against these defendants has as its objective the removal of Briscoe from his office as Public Safety Communications Director. The complaint alleges a claim in the nature of a quo warranto, pursuant to Conn. Gen.Stat. § 52–491, which reads in its entirety:

> When any person or corporation usurps the exercise of any office, franchise or jurisdiction, the Superior Court may proceed, on a complaint in the nature of a quo warranto, to punish such person or corporation for such usurpation, according to the course of the common law and may proceed therein and render judgment according to the course of the common law.[3]

The Union's quo warranto complaint in the State court alleges in ¶ 7 that Mayor Harp's transfer of Briscoe, a firefighter, to the position of Director of the Department of Public Safety Communications violated the Charter of the City of New Haven. The complaint further alleges in ¶ 9 that the transfer violated Conn. Gen.Stat. § 7–468(b), "which recognizes the plaintiff Union as the sole and exclusive bargaining agent for the defendant Briscoe and other similarly situated employees." Local 825's theory of the case is that a transfer by the City of Briscoe, a union member, from the position of firefighter to a different posi-

---

**2.** The account appearing in the two preceding paragraphs of text is based principally upon Briscoe's Notice of Removal in the captioned case. Paragraph 16 of the Notice of Removal states: "Since April 7, **2013**, Briscoe has performed the functions of Director of the Department of Public Safety Communications." Doc. 1, ¶ 16 (emphasis added). It is apparent from the context and other dates of record that "2013" is a typographical error. The correct date is "April 7, **2014**."

**3.** In earlier and more traditional days, the name of this procedure at law was italicized— *"quo warranto"*—in recognition of its Latin origin. *See, e.g., Hinckley v. Breen*, 55 Conn. 119, 9 A. 31 (1887). The phrase has been modernized, as the Connecticut Legislature did in the statute quoted in text, and contemporary cases and commentators have followed suit. This Ruling refers to the procedure as "quo warranto."

tion in City employment should have been negotiated between the City and the Union pursuant to the collective bargaining agreement then in force. The Mayor's failures and transgressions in these regards, Local 825 contends, brands Briscoe as one who "usurps the exercise" of his present office. The Union's quo warranto complaint in state court seeks Briscoe's removal from that usurped office.

Local 825's quo warranto complaint was signed on April 10, 2014 by James Kottage, the president of the Union. Kottage was one of the white firefighters who ultimately prevailed before the United States Supreme Court in the *Ricci* case. Frank Ricci, the white firefighter who gave his name to that case, is currently the vice-president of Local 825.

Briscoe was first served with process in the state court quo warranto action on April 22, 2014. On May 19, 2014, Briscoe filed a notice of removal [Doc. 1] removing the state court action to this Court, purportedly pursuant to 28 U.S.C. § 1443(1). Briscoe's theory of the case is stated in ¶ 1 of his notice of removal: "The plaintiff New Haven Firefighters 825 filed this lawsuit in Connecticut Superior Court in retaliation for Briscoe's pursuit of race discrimination claims in litigation in this Court

and on appeal." That retaliatory conduct on the Union's part, Briscoe contends, violated the anti-retaliatory provision in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3, and violated rights conferred by the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Local 825 now moves [Doc. 16] to remand the case to the Connecticut Superior Court. The notice to remand summarizes the Union's contentions: Briscoe "failed to demonstrate that either Title VII or § 1981 immunized him from the state court quo warranto proceeding and that such a state court proceeding would deny or prevent him from enforcing his equal civil rights." Doc. 16, at 1. Briscoe opposes a remand.

The Court heard oral argument on Local 825's motion to remand the case to state court. The case had been extensively briefed. Able arguments were presented by Ms. Cofrancesco for the Union and by Mr. Smith for Briscoe. The Court imposed no time limits, preferring to receive the benefits of full submissions by counsel, fueled by questions from the Court. As the afternoon shadows lengthened, those full submissions were achieved. The Union's motion to remand is now ripe for decision.[4]

---

4. I conclude this Procedural History by noting that Local 825 has also filed a complaint against the City of New Haven with the Connecticut State Board of Labor Relations, Case No. MPP–30,919. That regulatory complaint echoes the criticisms of the Union's quo warranto complaint with respect to Briscoe's job transfer, and prays for essentially the same relief: ordering the City "to cease and desist from effecting said transfer until the same can be negotiated with the Union." Briscoe obtained leave from the Board to intervene in the regulatory proceeding, and then filed a notice removing the proceeding to this Court under 28 U.S.C. § 1443(1), on the same theory of retaliation as asserted as the basis for removing the quo warranto action. *See New Haven Firefighters Local 825 v. New Haven,*

No. 3:15–cv–588. The State Board has moved to remand that case to itself. Briscoe then filed a related but separate action for a temporary order restraining the Board from proceeding with Local 825's regulatory complaint. *See Briscoe v. Chairperson of State Bd. of Labor Relations,* No. 3:15–cv–607. As the result of a telephone conference with the Court, counsel for the parties, with the valuable participation of Mr. Elliott, counsel for the Board, stipulated in No. 3:15–cv–607 that no further proceedings would take place in the regulatory action, Case Number MPP–30,919, unless and until the Court remanded No. 3:15–cv–588 to the Board. The Ruling in text is concerned only with Local 825's motion to remand No. 3:14–cv–716.

## II

In removing Local 825's quo warranto action from the state court to this federal court, Briscoe invokes 28 U.S.C. § 1443(1), a specialized application of removal jurisprudence whose caption reveals its relatively narrow character: "Civil rights cases." Other statutory removal provisions are more general and less precise. For example, if a plaintiff's state court complaint asserts a claim under the United States Constitution or a federal statute, the defendant's right to remove the case to federal court is absolute. 28 U.S.C. § 1441(a). In contrast:

a removal petition under 28 U.S.C. § 1443(1) must satisfy a two-pronged test. First, it must appear that the right allegedly denied the removal petitioner arises under a federal law providing for specific civil rights stated in terms of racial equality..... Second, it must appear, in accordance with the provisions of § 1443(1), that the removal petitioner is "denied or cannot enforce" the specified federal rights "in the courts of (the) State."

*Johnson v. Mississippi,* 421 U.S. 213, 219, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975) (citations and some internal quotation marks omitted).

Local 825's motion to remand this case raises the question of whether Briscoe satisfies both § 1443(1) prongs. The Union contends Briscoe fails both of them.

As for the first prong, it would not be sufficient for Briscoe to assert that Local 825's allegedly retaliatory state court quo warranto action deprived him of an array of First Amendment rights embraced by the comprehensive concept of "civil rights." In *City of Greenwood v. Peacock,* 384 U.S. 808, 825, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), the Supreme Court stressed that "the reference in § 1443(1) is to 'equal civil rights,' " a phrase that "does not include the broad constitutional guarantees of the First Amendment."

Briscoe identifies two federal statutes which he says fall within § 1443(1) and Local 825 violated. They are Title VII of the Civil Rights Act of 1964, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Title VII includes 42 U.S.C. § 2000e–3(a), which provides in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... or for a labor organization to discriminate against any member thereof ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

It is readily apparent that Briscoe has satisfied the first prong of § 1443(1) removal analysis. Briscoe claims in essence that he has the right to be free from Local 825 retaliating against him for his assertions of discrimination in the litigation spawned by the 2003 lieutenants examination. In *Johnson* the Court said that to qualify for a § 1443(1) removal, Briscoe must show that this allegedly denied right "arises under a federal law providing for specific rights stated in terms of racial

equality." 421 U.S. at 219, 95 S.Ct. 1591. (citation and internal quotation marks omitted). Both statutes fall within that category.

As for 42 U.S.C. § 2000e–3(a), a part of Title VII of the Civil Rights Act of 1964, the Court said of the plaintiffs in *Georgia v. Rachel*, 384 U.S. 780, 792, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966): "They also made allegations calling into play the Civil Rights Act of 1964. That Act is clearly a law conferring a specific right of racial equality," 384 U.S. at 792, 86 S.Ct. 1783, the provision in question being found in § 201(a) of the Act, which guaranteed to all "the full and equal enjoyment" of public accommodation places without discrimination on the ground of race. *Id.*

As for § 1981, the Supreme Court said in *Peacock*, 384 U.S. at 825, 86 S.Ct. 1800, that it need not "pursue to a conclusion" a "precise definition of the limitations of the phrase 'any law providing for ... equal civil rights' in § 1443(1)" because "we may proceed here on the premise that at least the two federal statutes specifically referred to in the removal petitions, 42 U.S.C. § 1971 and 42 U.S.C. § 1981, do qualify under the statutory definition."

These cases teach us, then, that the quoted provisions in 42 U.S.C. §§ 2000e–3(a) and 1981(a) are numbered among the laws collectively referred in 28 U.S.C. § 1443(1) as "any law providing for the equal civil rights of citizens of the United States." One must now consider whether the particular claim asserted by Briscoe arises under the cited and quoted laws. I consider that question with respect to each of the cited federal laws in order.

## III

### A

*42 U.S.C. § 2000e–3(a)*

Local 825 contends that Title VII cannot support Briscoe's claim in the case at bar.

The Union construes the statute as articulating only employer liability for discrimination. Briscoe's claim fails, the Union argues, because "he fails to allege any conduct by Local 825 which would invoke *union* liability under Title VII. Local 825 is not, nor was not, Michael Briscoe's employer." Local 825 Brief [Doc. 16–1] at 7 (emphasis in original).

That argument disregards the plain language of § 2000e–3(a), which after specifying particular areas in which an employer may not discriminate "against any of his employees," goes on to provide that it shall be unlawful "for a labor organization to discriminate against any member thereof ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this subchapter." Briscoe's removal petition adequately alleges that Local 825, the "labor organization" of which Briscoe was and is a member, retaliated against him because white officers of the Union were angered by Briscoe's initiating and pressing litigation claims that the City's implementation of the 2003 examination had a disparate impact, preferring white candidates over black candidates for promotion, thereby violating Title VII. That retaliation, Briscoe asserts, took the form of the quo warranto action Local 825 filed in the state court for the purpose of ousting Briscoe from his new position: an action the Union was under no legal compulsion to take, its commencement lying within the discretion of the Local 825 officers.

I conclude without difficulty that if retaliatory intent caused Local 825 to file its state court quo warranto action against Briscoe, such conduct on the part of the

Union would constitute a prohibited form of discrimination in violation of Title VII, 42 U.S.C. § 2000e–3(a). It is well settled by the law of this circuit that a labor union, whose officers are irritated by a union member, retaliates against that member by exercising discretionary powers for the purpose of harming him, violates Title VII. *See, e.g., Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir.1980); *EEOC v. Locals 14 and 15, Int'l Union of Operating Eng'rs*, 438 F.Supp. 876 (S.D.N.Y.1977).

In *Grant*, the Second Circuit rejected the appeal of a "Union and three of its officers" from the district court's judgment that "they discriminated against the appellees, three black ironworkers employed by Bethlehem Steel Corporation in the structural steel industry, in retaliation for their prosecution of charges against Bethlehem and the Union before the Equal Employment Opportunity Commission (EEOC) and in a Title VII class action." 622 F.2d at 44. The discrimination engaged in by the union and its officers took the form of "the manner in which it referred steelworking jobs," the black plaintiffs alleging that "because they had brought the EEOC charges and Title VII class action, the Union retaliated by referring them only to short-term work or to no work at all." *Id.* at 45. The district court held after a bench trial that the plaintiffs had proved their allegations and awarded back pay. The Second Circuit affirmed. Judge Lumbard's opinion held first that the plaintiffs "established a prima facie case of retaliation," given that "[t]he Union conceded that the plaintiffs engaged in protected activity under Title VII, and it can hardly be denied that the plaintiffs were disadvantaged by the Union's manner of referring jobs." 622 F.2d at 46. The court of appeals affirmed the district court's judgment in plaintiffs' favor because "the Union failed to articulate any legitimate non-

discriminatory reasons for its actions, and the reasons it did advance were mere pretexts for retaliatory discrimination." *Id.* at 47.

The Second Circuit's opinion in *Grant*, 622 F.2d at 46, cites with approval Judge Tenney's opinion for the district court in *Locals 14 and 15*, 438 F.Supp. 876 (S.D.N.Y.1977). That case began with a pattern-and-practice-of-discrimination suit the EEOC had brought under Title VII against Locals 14 and 15. A number of union members had complained about discrimination against them and appeared as witnesses on behalf of the EEOC at the trial. The district court found in favor of the *EEOC v. Local 14 Intern. Union of Operating Engineers*, 415 F.Supp. 1155 (S.D.N.Y.1976), and entered a remedial order. The defendant unions, including Local 15, appealed to the Second Circuit, which affirmed in part, reversed in part, and remanded the case to the district court for further proceedings. 553 F.2d 251 (2d Cir.1977). During the proceedings on remand, the EEOC filed a motion under Fed.R.Civ.P. 65 for an order enjoining Local 15 from "in any ... way discriminating against any person because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing authorized by Title VII." 438 F.Supp. at 879. Judge Tenney conducted a further evidentiary hearing and found that at the pertinent times Local 15 operated a job referral system for its members. Union members seeking work signed up on a list in a hiring hall. Judge Tenney further found:

> Local 15 business representatives retained and exercised the power to refer men out of order from the list and to honor employer requests for specific individuals.
>
> Plaintiff's evidence herein, virtually unchallenged, shows that the effect of

this referral system was to deprive those who testified for the EEOC at the first trial of the opportunity to find work. 438 F.Supp. at 882. Judge Tenney characterized this union conduct as "discrimination and retaliation against the EEOC witnesses," and held: "Failure of a union to refer members to work because of their protected activities violates Section 704(a) of Title VII, 42 U.S.C. § 2000e-3(a)." *Id.* at 883 (citation omitted). Section 2000e-3(a) is the Title VII provision Briscoe alleges Local 825 violated in the case at bar. Judge Tenney issued an injunction against Local 15 barring further retaliation, and provided for the recovery of the union members' pecuniary losses. *Id.* at 885.[5]

In the case at bar, Briscoe alleges that Local 825 violated Title VII by filing its quo warranto action against him for a retaliatory motive. His theory of the case fits within the results and rationales of cases like *Grant* and *Local 15*. The Second Circuit summarized the elements of a Title VII retaliation claim in *Grant:*

> The legal standards applicable to a Title VII retaliation suit are not in dispute. Both sides agree that in order to establish such a claim, the plaintiff must show: first, protected participation or opposition under Title VII known by the alleged retaliator; second, an employment action or actions disadvantaging persons engaged in protected activities; and third, a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions.

622 F.2d at 46 (citing *Locals 14 and 15* ). To that summary, Judge Lumbard's opinion added: "As for the third element, courts have recognized that proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment." *Id.* (citations omitted).

The circumstances of the case at bar mirror those elements. First, Briscoe's efforts to challenge by litigation the 2003 promotional examination as discriminatory—by unsuccessful efforts to intervene in the *Ricci* and *Tinney* cases, then by his own direct action before the EEOC and this Court—constitute protected action because Briscoe's underlying charge was and is that the City violated Title VII. Second, Local 825's state court quo warranto action, if it succeeds, will work to Briscoe's obvious disadvantage: he will be ousted from his new position with the City. Third, Briscoe alleges that his protected Title VII activity engendered animosity and retaliatory intent on the part of the white officers of Local 825, resulting in the quo warranto action, thereby establishing the requisite causal connection of "a retaliatory motive playing a part in the adverse employment actions" inherent in the quo warranto action.

I do not understand Local 825 to dispute in any substantive way Briscoe's showing of the first two elements. But the Union vigorously contests the third element: that Briscoe's allegation that the Union had a retaliatory motive for its quo warranto action. Local 825 professes itself to be motivated by a desire to fulfill its role "in

---

**5.** There were other manifestations in *Locals 14 and 15* of Local 15's discrimination against union members who testified for the EEOC, specifically, the Local's manipulation of its dues structure, suspension procedures, and admission practices. 438 F.Supp. at 883–85. In addition, Judge Tenney found evidence of Local 15's retaliatory motive in the contemporaneous utterances of union officers: "As brought out in the prior trial, there were at least two meetings of Local 15 at which derogatory comments were made about the EEOC witnesses or where members were advised not to answer EEOC questionnaires." *Id.* at 885.

safeguarding its members' rights pursuant to law, the collective bargaining agreement and the civil service rules and regulations of the City of New Haven," Brief [Doc. 16–1] at 2, all of which the Union contends were violated by the manner in which Mayor Harp arranged Briscoe's appointment to his new position.

As for the prospect of animosity between white and black firefighters in the Department, the brief for Local 825 at 14 concedes its existence: "Local 825 is also well aware of the mixed feelings among firefighters as a result of the City of New Haven's 2003 promotional exams and the *Ricci* case and the other cases which comprise the history of tension between firefighters and the City of New Haven." I am not sure that this carefully worded acknowledgment does full justice to the depths of personal feelings revealed by the record. Briscoe's amended counterclaims [Doc. 31] collect at ¶ 25 assertions made by or ascribable to Kottage, Ricci and others in court filings: specifically, that Briscoe's Title VII suit in this Court was nothing more than "legal revanche" and an offensive "use of the race card" that "stalled ... careers" and "destroy[ed] workplace morale, stoke[d] racial antagonisms, undermine[d] command authority, and severely undermine[d] the esprit de corps and mutual respect" within the fire department. These white firefighters complained that Briscoe brought his lawsuit to "besmirch and de-credential" the firefighters who had won promotion through the *Ricci* lawsuit; and that, if Briscoe prevailed, it "would diminish [those members'] status, stain their badges, impugn their professional standing, and result in their being held up to derision and scorn in their workplace and in their profession at large."

I have in effect quoted in its entirety ¶ 25 of Briscoe's amended counterclaims. The same assertions appeared in Briscoe's initial Notice of Removal [Doc. 1] at ¶ 17. Local 825 does not question the accuracy of these quotations from court filings. I regard this account as probative of the state of mind of Local 825 officers at the time the Union commenced its quo warranto action in the state court.

■ Local 825 moves to remand this removed case to the state court where it began, for adjudication of the Union's quo warranto claim that Briscoe should be ousted from his present position as Director of Public Safety Communications. As noted, Local 825 insists that no retaliatory motive contributed to the filing of that action. That issue of fact may ultimately be resolved by evidentiary hearing, but it is premature to consider it now. A party seeking to justify removal is not required to "win his case before he can have it removed"; the question is whether his removal petition "presents a colorable federal defense." *Jefferson County, Alabama v. Acker,* 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999). In *New York v. Galamison,* 342 F.2d 255, 261–62 (2d Cir. 1965), Judge Friendly said that removal was proper if the case turned on questions "Congress meant to have decided in a federal trial; a defendant seeking removal under that section [§ 1443(2)] does not have to prove preliminarily that he will prevail." [6]

On the first prong of § 1443(1) removal analysis, the question presented is whether Briscoe's allegations of Union officers' retaliatory intent in bringing the quo war-

6. *Galamison* considered removal under the alternative basis provided by 28 U.S.C. § 1443(2). That subsection is not implicated in the case at bar, where Briscoe seeks removal solely on the basis of § 1443(1). But Judge Friendly's reasoning, expressed in characteristically trenchant fashion, applies to cases under both sections of the statute.

ranto action are sufficient to bring this action within that civil rights cases' removal statute. Cases like *Jefferson County* and *Galamison* teach us to regard the question as the functional equivalent of that presented by a motion to dismiss a civil action under Fed.R.Civ.P. 12(b)(6) for failure to state a claim, with the district court "accepting all factual allegations in the complaint as true and drawing all inferences in the plaintiff's favor." *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir.2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted). To state a plausible claim, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

If the removal of this case is sustained, Briscoe will bear the burden of proving in this Court that Local 825's filing of the quo warranto action in state court was a retaliatory act of racial discrimination. Whether Briscoe can do so is for future determination. At this requested remand stage of the litigation, the question is whether Briscoe has stated a plausible retaliation claim. I conclude that he has done so.

Future evidence may show, as the Union now proclaims, that the Union filed the quo warranto action solely for the laudable objectives professed in its brief, and was in no way motivated by the ignoble objective of retaliation. However, before Local 825 filed the quo warranto action (and before any occasion for it had arisen, Briscoe not yet having been transferred to his present position), white members of Local 825, including its present officers, denigrated Briscoe in court filings in language redolent of personal animosity and racial overtones. I am in no way critical of these firefighters' exercise of their right of free speech, which given the litigation context have a privilege of their own. But the Union officers' comments may fairly be considered as probative of their states of mind; and a claim of retaliation necessarily focuses upon the alleged retaliator's state of mind. There is no reason in this case to accept the advice famously given by a former Attorney General of the United States: "Watch what we do, not what we say." In the circumstances of the case at bar, including the recognized racial tensions that regrettably divide and distract the brave firefighters who risk their lives in the City's service, it is not implausible to think that what Kottage, Ricci and others *said* about Briscoe evidenced a state of mind that caused or contributed to what Local 825 subsequently *did* to Briscoe.

■ In short: Briscoe asserts in his Notice of Removal a plausible claim that Local 825's filing of the state court quo warranto action constituted an act of retaliation motivated by racial discrimination, in violation of Title VII. That satisfies the first prong of § 1443(1) analysis, which requires Briscoe's pleading to make it appear that the right allegedly denied him "arises under a federal law providing for specific civil rights in terms of racial equality." The second prong requires Briscoe to show that he is "denied or cannot enforce" that federal right in the state court. That question is considered in Part IV, *infra*. First, however, Part III.B. considers whether Briscoe pleads a viable claim under the second federal law he relies upon: 42 U.S.C. § 1981.

**B**

### 42 U.S.C. § 1981

As an alternative basis for removal under 28 U.S.C. § 1443(1), Briscoe relies

upon 42 U.S.C. § 1981(a), whose most relevant provisions state: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." Section 1981(b) defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits.... of the contractual relationship."

Given that wording, Local 825 does not and could not dispute that this is "a federal law providing for specific civil rights stated in terms of racial equality," one of the requirements of § 1443(1). What the Union contends, not surprisingly, is that the issues presented by the Union's quo warranto action against Briscoe, which tests Briscoe's *de jure* right to occupy the position to which Mayor Harp appointed him, have precisely nothing to do with Briscoe's right "to make and enforce" a *contract.* Specifically, Local 825 quotes the Supreme Court's holding in *Domino's Pizza, Inc. v. McDonald,* 546 U.S. 470, 476, 126 S.Ct. 1246, 163 L.Ed.2d 1069 (2006): "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship,' § 1981(b), under which the plaintiff has rights." Local 825 argues that Briscoe has not and cannot make that showing: "Michael Briscoe has not identified any such contract because he does not have a contract with the City of New Haven for his 'promotion' to Acting Director of the Department of Public Safety Communications." Doc. 16–1, at 10–11. It follows, Local 825 reasons, that in the case at bar, § 1981 cannot give rise to a

claim cognizable as a basis for removal under § 1443(1).

Local 825's argument on this aspect of the case skims over the fact that Briscoe's underlying claim against the Union is for retaliation. Counsel for Briscoe, in an effort to avoid the Supreme Court's holding in *Domino's Pizza,* cite the Court's subsequent decision in *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 451, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008), where the majority said: "[T]he view that § 1981 encompasses retaliation claims is indeed well embedded in the law." On the facts presented in *Domino's Pizza,* the Court held in a unanimous opinion by Justice Scalia [7] that § 1981 did not give rise to a cognizable claim. On the facts presented in *CBOCS West,* the Court held by a 7–2 vote in an opinion by Justice Breyer that a claim lay under § 1981. Justice Thomas wrote a vigorous dissent, in which Justice Scalia joined: "It is difficult to see where one finds a cause of action for retaliation in [§ 1981(a) ]. On its face, § 1981(a) is a straightforward ban on racial discrimination in the making and enforcement of contracts. Not surprisingly, that is how the Court has always construed it." 553 U.S. at 458, 128 S.Ct. 1951 (citing *Domino's Pizza* as the first in a string of Supreme Court decisions).

*Domino's Pizza* and *CBOCS West* comprise the most recent sources of Supreme Court instruction on the scope and application of § 1981. The cases are fact specific. In order that I may be properly instructed in the case at bar, it is necessary to consider these two opinions with care.

The plaintiff in *Domino's Pizza* was John McDonald, a black man, and the sole shareholder and president of JWM, Investments, Inc., a corporation. JWM and defendant Domino's entered into several

---

**7.** Justice Alito did not participate.

contracts under which JWM was to construct four restaurants and lease them to Domino's. JWM and Domino's had a falling out, the four contracts remained uncompleted, JWM filed for bankruptcy, the bankruptcy trustee initiated an adversary proceeding against Domino's for breach of contract, that claim was settled for $45,000, and JWM gave Domino's a complete release. During the pendency of the bankruptcy proceeding, McDonald filed a § 1981 action against Domino's in his personal capacity. The theory of his case was that Domino's had broken its contracts with JWM because of racial animus toward McDonald. The Ninth Circuit allowed McDonald's § 1981 action to proceed, reasoning that while "an injury suffered only by the corporation would not permit a shareholder to bring a § 1981 action," when "there are injuries distinct from that of the corporation, a nonparty like McDonald may nonetheless bring suit under § 1981." 546 U.S. at 474, 126 S.Ct. 1246 (citation and internal quotation marks omitted). The Supreme Court reversed and directed dismissal of the § 1981 action.

Justice Scalia began the Court's unanimous opinion by framing the issue thus: "We decide whether a plaintiff who lacks any rights under an existing contractual relationship with the defendant, and who has not been prevented from entering into such a contractual relationship, may bring suit under Rev. Stat. § 1977, 42 U.S.C. § 1981." 546 U.S. at 472, 126 S.Ct. 1246. With that opening's tenor, the reader is not surprised to learn that the Court's answer is "No." The Court identified the right protected by this section of the civil rights statutes as "the right—denied in some States to blacks, as it was denied at common law to children—to give and receive *contractual rights* on one's own behalf." *Id.* at 475, 126 S.Ct. 1246 (emphasis in original). Given that particular purpose, the Court reasoned:

Any claim brought under § 1981, therefore, must initially identify an impaired "contractual relationship," § 1981(b), under which the plaintiff has rights. Such a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who have already made contracts.... We have never retreated from what should be obvious from reading the text of the statute: Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.

Absent the requirement that the plaintiff himself must have rights under the contractual relationship, § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms, but only if the animus and the hurt it produced were somehow connected to *somebody's* contract. We have never read the statute in this unbounded—or rather, *peculiarly* bounded—way.

546 U.S. at 476, 126 S.Ct. 1246 (citations and footnote omitted).

While McDonald's personal § 1981 complaint against Domino's "does identify a contractual relationship, the one between Domino's and JWM," the pleading failed to state a viable claim because "the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." 546 U.S. at 477, 126 S.Ct. 1246. The Court rejected plaintiff's proposed "new test for § 1981 standing," namely, a person may invoke the section if he is an "actual target" of discrimination who "loses some benefit that would otherwise have inured

to him had a contract not been impaired," an individual being an "actual target" under this formulation "if he was the *reason* a defendant chose to impair its contractual relationship with a third party." *Id.* at 478, 126 S.Ct. 1246. That test failed to find favor with the Court because it "simply ignores the explicit statutory requirement" that the plaintiff be the person whose right to make and enforce contracts was impaired on account of race. *Id.* By the same token, the Court rejected McDonald's resort to policy arguments:

> The most important response, however, is that nothing in the text of § 1981 suggests that it was meant to provide an omnibus remedy for *all* racial injustice. If so, it would not have been limited to situations involving contracts. Trying to make it a cure-all not only goes beyond any expression of congressional intent but would produce satellite § 1981 litigation of immense scope.

546 U.S. at 479, 126 S.Ct. 1246.

The plaintiff in *CBOCS West* was Hedrick Humphries, a black man, and a former assistant manager of a Cracker Barrel restaurant, owned by defendant CBOCS West. The theory of Humphries's case against CBOCS was that CBOCS had dismissed him from his employment for two reasons: (1) because of racial bias and (2) because Humphries had complained to managers that a fellow assistant manager had dismissed another black employee for race-based reasons. Humphries filed a suit "alleging claims of discrimination and retaliation under Title VII and 42 U.S.C. § 1981 against CBOCS West, Inc., based on his discharge as an associate manager at one of defendant's Cracker Barrel restaurants." 474 F.3d 387, 389 (7th Cir. 2007). The district court dismissed the Title VII claim on procedural grounds, which Humphries did not challenge on ap-

peal, and granted summary judgment to CBOCS on the § 1981 claim, which a divided panel of the Seventh Circuit reversed. Judge Williams said for the majority: "We reverse the district court's grant of summary judgment as to Humphries's retaliation claim because Humphries made a sufficient showing under the indirect method to establish a prima facie case of retaliation under section 1981." *Id.* To arrive at that result, it was necessary for the Seventh Circuit to conclude that a retaliation claim was cognizable under § 1981. The Seventh Circuit majority held that it was, relying principally on the Supreme Court's decision in *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969). Thus the majority captioned a section of its opinion, 474 F.3d at 393, with this language: "*Sullivan v. Little Hunting Park, Inc.* Leads Courts To Conclude that Section 1981 Protects Against Retaliation." Judge Easterbrook's dissent on this point relied upon *Domino's Pizza:*

> Less than a year ago, in *Domino's Pizza,* the Court reiterated *Patterson*'s interpretive stance.[8] *Sullivan,* by contrast, did not receive a mention. Yet my colleagues do not mention *Domino's Pizza.* Why bypass the Supreme Court's 2005 understanding of § 1981 in favor of a 1969 understanding of § 1982?

474 F.3d at 411.

The Supreme Court granted CBOCS's petition for certiorari. Justice Breyer began his opinion for a 7–2 majority by quoting the provision in § 1981 that "all persons" shall "have the same right" to "make and enforce contracts ... as is enjoyed by white citizens." He referred to that section as "the older 'equal contract rights' provision," and posed the issue in the case as follows:

---

**8.** *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

The basic question before us is whether the provision encompasses a complaint of retaliation against a person who has complained about a violation of another person's *contract-related* "right." We conclude that it does.

553 U.S. at 445, 128 S.Ct. 1951 (emphasis added). The Court does not expand upon the identity of the contract giving rise to the "contract-related right" in the case, but it is clear from the context that the reference is to the contracts of employment between CBOCS West as employer and the involved individuals as employees, particularly non-party Green, the employee CBOCS discharged, and plaintiff Humphries, who complained about Green's discharge and was himself discharged, allegedly in retaliation.[9] The majority's conclusion in *CBOCS West* that § 1981 encompasses a retaliation claim arising out of a "contract-related right" depends in significant measure on *stare decisis*, with particular deference paid to *Sullivan v. Little Hunting Park, Inc.* Justice Thomas's dissent, in which Justice Scalia (the author of *Domino's Pizza*) joined, argued that *Sullivan* did not deserve *stare decisis* effect, and *CBOCS West* should arrive at the same conclusion as *Domino's Pizza:* neither plaintiff stated a viable claim under § 1981.

What instructions should this district judge, responsible for Briscoe's § 1981 claim, derive from the Supreme Court's opinions in *Domino's Pizza* and *CBOCS West*?

The first lesson these cases teach is that proof by Briscoe that Local 825 acted out of racial animus and retaliatory intent in filing its quo warranto action against him, for the dishonorable purpose of ousting Briscoe from his new City position, would not be sufficient standing alone to sustain a viable claim under § 1981. One can readily accept that Briscoe has been injured by having to defend his new position against the Union's quo warranto challenge, let alone the greater injury inherent in the loss of his position if the state court decides the quo warranto action against him; and surely the filing of that action, if motivated by racial animus and a desire to retaliate against Briscoe for his protected activity, would be wrongful (a self-evident proposition). However, to establish a claim under § 1981, Briscoe must show in addition that Local 825's conduct deprived him of a right created by an identifiable contract. Section 1981 is, in Justice Breyer's introductory phrase in *CBOCS West*, the "equal *contract* rights provision," and a violated right, to be remediable under that section, must be *"contract-related."* Justice Scalia summed up the provision when he said in *Domino's Pizza:* "Section 1981 offers relief when racial discrimination blocks the creation of a *contractual relationship*, as well as when racial discrimination impairs an existing *contractual relationship*, so long as the plaintiff has or would have rights under the existing or proposed *contractual relationship*." 546 U.S. at 476, 126 S.Ct. 1246. Justice Scalia managed to use the phrase "contractual relationship" three times in a single sentence, thereby recalling the shade of Lewis Carroll.[10]

---

**9.** Circuit Judge Easterbrook makes that contractual nexus plain when he said in his dissent that "Section 1981 does offer one opening for a claim of retaliatory discharge." He posited that "Suppose Cracker Barrel regularly fired black employees who protest discrimination in the workplace, but not protesting white employees. Then it might be appropriate to conclude that black persons do not enjoy the same right as white persons *to contract with Cracker Barrel*." 474 F.3d at 411 (emphasis added).

**10.** "What I tell you three times is true." Carroll, *The Hunting of the Snark* (1876).

Counsel for Briscoe recognize the need to place his § 1981 claim within a contractual setting. His brief attempts that by asserting that "Briscoe is a unionized employee of the City of New Haven," and as such "Briscoe has contractual rights under the collective bargaining agreement between the City and Local 825, his union." Doc. 21, at 12. A collective bargaining agreement ("CBA" in ordinary parlance) is, of course, a *contract.* Typically, and in this case, the signatories to that contract are a labor union and an employer (or group of employers). Members of the union become employees of the employer (hence counsel's phrase "a unionized employee"). In a footnote at 12 n. 6, counsel collect cases which consider how to characterize an individual union member who did not directly sign the collective bargaining agreement: is he or she a party to the contract, or a third-party beneficiary of it, or something else ("*sui generis*" in the self-conscious language of the law). "The precise taxonomy of Briscoe's contractual rights as a union member," his brief argues dismissively, "is of no import: it is clear that the right is sufficient to be protected from discrimination and retaliation under Section 1981." Brief, at 12. That assertion is restated in the footnote, n. 6 at 13: "But whatever the exact status of those rights, the point is that union members have contractual rights related to their employment status."

We must focus, then, upon Briscoe's theory that the collective bargaining agreement and § 1981 combine in such a way as to protect Briscoe from Local 825's allegedly retaliatory and discriminatory filing of the quo warranto action. Briscoe grounds that theory upon the provision in § 1981(b), added by Congress in 1991, that

the term "make and enforce contracts" in the present § 1981(a) "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." [11] However, when Briscoe's brief at 13 quotes that language from § 1981(b), a certain transformation takes place. This is the way the brief appears:

> What matters is that Briscoe has contractual rights as part of the tripartite union-employer-employee relationship, and Section 1981 grants him a right to "enjoy[ ] all benefits, privileges, terms and conditions of the contractual relationship," 42 U.S.C. 1981, free from retaliation for pursuing complaints of racial discrimination.

In point of fact, the statutory language in § 1981(b) (mis-cited in the brief as "1981"), places a *period* after the concluding phrase "contractual relationship." Briscoe's brief replaces the period with a *comma,* closes the quote marks, sets off the statutory citation with a further comma, and adds the words "free from retaliation for pursuing complaints of racial discrimination." Finally a *period* is utilized, after the phrase "racial discrimination."

The point of all this is that an inattentive reader might think the concluding reference to "free from retaliation" *etc.* was part of the statute, rather than what it is: an exercise in advocacy by counsel. Briscoe's theory is that § 1981's anti-retaliation remedy should be construed so broadly that it leaves Briscoe "free from retaliation for pursuing complaints of racial discrimination" wherever and whenever the retaliation occurs, whether or not the retaliatory conduct impairs Briscoe's rights under the collective bargaining

---

**11.** The phrase with which § 1981(b) concludes, "contractual relationship," is clearly the source of Justice Scalia's thrice-repeated "contractual relationship" in the *Domino's Pizza* opinion, quoted in text.

agreement, which is the existing contract in the § 1981 analysis.

Briscoe must make that argument because the Local 825 conduct he condemns as retaliatory is the Union's filing of the state court quo warranto action. That action challenges Briscoe's *de jure* entitlement to a different, non-firefighting position in the City government. The merits of the quo warranto action, whatever they may be, do not arise out of the provisions of the collective bargaining agreement between the Union and the City. As is typical, the collective bargaining agreement, or "CBA" in common parlance, between Local 825, a firefighters' union, and the City of New Haven is for a stated period of time. Members of the Union become City employees. The CBA specifies union members' compensation and benefits, defines the terms and conditions of their employment, and contains grievance procedures for disputes arising out of the meaning or implementation of the CBA. The CBA in this case says nothing about an individual union member's ambition to become New Haven's Director of Public Safety Communications; or how his application for and appointment to that position should be structured; or how, once appointed, his *de jure* entitlement to the position should be evaluated. It would be surprising, indeed passing strange, to find such provisions in a collective bargaining agreement, and in fact there are none.

It is problematic, even counterintuitive, to discern so all-inclusive a freedom from retaliation in a statute which confers the relatively narrow (although important) right "to make and enforce contracts," § 1981(a), with its concomitant right to enjoy the benefits of the resulting "contractual relationship," § 1981(b). The Supreme Court's decision in *CBOCS West*, which Briscoe correctly cites for the general proposition that § 1981 encompasses a claim for retaliation, does not support the broad construction Briscoe seeks to engraft upon the statute. In *CBOCS* the plaintiff, an employee, complained of the defendant employer's retaliatory conduct in discharging plaintiff: a violation of plaintiff's fundamental right arising directly from the contract of employment forming the subject matter of the action. It requires a considerable stretch to equate, for § 1981 purposes, the collective bargaining agreement in the case at bar with the contract of employment in *CBOCS West*.[12]

Moreover, in *CBOCS West* the Court emphasized the Congress's 1991 passage of § 1981(b), and Justice Breyer's opinion noted: "After enactment of the new law, the Federal Courts of Appeals again reached a broad consensus that § 1981, as amended, encompasses retaliation claims." 553 U.S. at 451, 128 S.Ct. 1951 (string of citations omitted). The first case cited for that proposition is the Second Circuit's opinion in *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684 (2d Cir.1998), where Judge Kearse said:

> 126 S.Ct. 1246. *Domino's Pizza* did not involve a claim of retaliation; that development in Supreme Court jurisprudence awaited the advent of *CBOCS West*. But both cases instruct that to be viable under § 1981, a plaintiff's claim must arise directly out of a specifically identified, proposed or existing contract between plaintiff and defendant, or the contractual relationship created by such an existing contract.

---

12. The same may be said of the Supreme Court's decision in *Domino's Pizza*. The contracts forming the subject matter of that case called for JMW, a corporation, to construct restaurants for Domino's Pizza, which allegedly breached the contracts because of racial animus toward the plaintiff, JMW's sole shareholder. The Court rejected plaintiff's § 1981 claim on the ground that he "lacks any rights under an existing contractual relationship with the defendant," 546 U.S. at 472,

We remain of the view, in light of the broad sweep of § 1981(b), that a retaliation claim may be brought under § 1981. However, to be actionable under § 1981, the retaliation must have been in response to the claimant's assertion of rights that were protected by § 1981. An act of retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981.

163 F.3d at 693 (citations and internal quotation marks omitted). The Second Circuit dismissed plaintiff's § 1981 claim on that ground: "Hawkins's September 1991 complaint to the administrative agencies that she had been denied promotions did not involve the assertion of a right that was then protected by § 1981. Any retaliation against her for filing that complaint was thus not cognizable under § 1981." Id. at 694. Plaintiff had succeeded at trial on her accompanying Title VII claim.

The relevance to Briscoe's case of the Second Circuit's decision in *Hawkins*, which preceded the Supreme Court's decision in *CBOCS West* but is not affected by it, is that *Hawkins* draws a distinction between a Title VII retaliation claim, which may be cognizable on the facts proved, and a § 1981 retaliation claim, which may not be on the same facts. That decision resonates in the case at bar. I have concluded in Part III.A. that Briscoe's notice of removal and counterclaim state a viable claim that Local 825 violated Title VII by retaliating and discriminating against him through the vehicle of the quo warranto action. The question in this Part is whether Briscoe has pleaded a viable § 1981 claim.

I conclude that he has not. A right arising from a contract or contractual relationship is essential to a viable § 1981 claim, under § 1981(a) or 1981(b). Briscoe's effort to demonstrate that necessary element—the existence of a relevant contract or contractual relationship—comes down to this: Local 825 and the City entered into a collective bargaining agreement. A collective bargaining agreement is a contract. Briscoe is a member of Local 825. He is therefore entitled to claim the benefits of that contract, as a party to the contract, its third-party beneficiary, or in some other *persona*. A union entering into a collective bargaining agreement with an employer necessarily promises its members, impliedly if not explicitly, that the union will not surrender to racial animus and retaliate against a member for the purpose of causing him harm, of whatever nature or in whatever context. It follows that Local 825's quo warranto action against Briscoe, allegedly motivated by racial animus and the retaliatory objective of ousting Briscoe from his present City job, violates Briscoe's rights under the collective bargaining agreement, which is a contract, or to be more precise, the § 1981 contract in this case. Q.E.D.

While counsel's ingenuity do them credit, I find that I cannot accept this formulation. It departs impermissibly from the more precise wording of the statute, substitutes a contract on the periphery of the action for the requisite contract at its core, and disregards the interpretative strictures of Supreme Court decisions. In *Domino's Pizza* Justice Scalia cautioned lower court judges against a statutory interpretation so broad that " § 1981 would become a strange remedial provision designed to fight racial animus in all of its noxious forms, but only if the animus and the hurt it produced were somehow connected to *somebody's* contract." 546 U.S. at 476, 126 S.Ct. 1246 (emphasis in original). Justice Scalia added, with some asperity: "We have never read the statute in this unbounded—or rather, *peculiarly*

bounded—way." *Id.* That analysis militates against Briscoe's invocation of § 1981, which proceeds on the theory that the Union's retaliatory quo warranto action and the hurt to Briscoe it produces are "somehow connected to somebody's contract," namely, the collective bargaining agreement between the Union and the City, of which Briscoe proclaims himself to be the third-party beneficiary of an unstated and implied contractual prohibition against Union discrimination and retaliation.

Briscoe cites no appellate authority for so far-reaching an interpretation of so precisely worded a remedial statute, and the Court's research has not disclosed any. Briscoe's Brief, Doc. 21, at 12 n. 6, collects Supreme Court cases which consider individual union members' rights under collective bargaining agreements, but they furnish no support for Briscoe's theory that he has a cognizable claim under § 1981 against Local 825 on the facts of this case. The cited cases deal with entirely different questions. *See Ass'n of Westinghouse Salaried Emp. v. Westinghouse Elec. Corp.,* 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510 (1955) (action against employer to recover salary payments allegedly owed to union members under a collective bargaining agreement); *Wooddell v. Int'l Bhd. of Elec. Workers, Local 71,* 502 U.S. 93, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991) (action by union members against union alleging discrimination in job referral procedures made pursuant to collective bargaining agreement); *United Steelworkers of Am., AFL–CIO–CLC v. Rawson,* 495 U.S. 362, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990) (following fatal fire in mine, action by union members' survivors against union for alleged fault in participating in joint mine safety inspections pursuant to collective bargaining agreement). None of these cases construed § 1981. They furnish no assistance in determining whether Briscoe

has pleaded a cognizable claim under § 1981 against Local 825.

■ For the foregoing reasons, the Court concludes that Briscoe does not sufficiently allege a claim against Local 825 pursuant to 42 U.S.C. § 1981 to justify a removal of the Union's state court quo warranto action to this Court pursuant to 28 U.S.C. § 1443(1).

## IV

In Part III.B., *supra,* the Court concluded that Briscoe sufficiently pleaded the denial by Local 825 of a right afforded him by "a federal law providing for specific rights in terms of racial equality," namely, 42 U.S.C. § 2000e–3(a), a part of Title VII of the Civil Rights Act of 1964. That satisfies the first of the two prongs Briscoe must establish to warrant removal under 28 U.S.C. § 1443(1). I turn now to a consideration of whether Briscoe has satisfied the second prong, which poses the question: Has Briscoe shown that he "is denied or cannot enforce" that federal Title VII right in the courts of the State of Connecticut?

Briscoe's contention on that question is that "State law, including in particular Conn. Gen.Stat. § 52–122, prohibits Briscoe from protecting or enforcing his federal rights in the quo warranto action in state court." Notice of Removal [Doc. 1], at ¶ 22. Briscoe expands on that contention in his brief opposing remand [Doc. 21] at 14–19. His argument is that when the Connecticut Legislature enacted the Practice Act of 1879 which "abolished the procedural differences between law and equity [and] instituted the unitary form of civil action [in Connecticut]", *State v. Clemente,* 166 Conn. 501, 541, 353 A.2d 723 (1974), "the Practice Act *explicitly excepted* quo warranto actions from the merger of law and equity." Brief, at 15 (emphasis in

original). "Briscoe cites section 32 of the 1879 Practice Act," which provided in pertinent part: "Sections one ... five [and] six ... of this Act [the provisions merging law and equity] shall not affect ... proceedings of ... *quo warranto,* or in the nature of *quo warranto* ..."

In *Hinckley v. Breen,* 55 Conn. 119, 9 A. 31 (1887), the Supreme Court of Connecticut had occasion to consider that relatively new aspect of state practice. The case involved which of two groups of citizens constituted the lawful committee of a school district. The plaintiff group sought by a bill in equity to restrain the other group from acting as committee members. The trial court dismissed the complaint "on the sole ground that the plaintiffs had misconceived the form of action." 9 A. at 31. The Supreme Court affirmed. The court observed that "Before the practice act [of 1879] it is very clear that title to an office could only be tried on a writ of *quo warranto,* or proceedings in the nature of *quo warranto.* A bill in equity was not an appropriate remedy." *Id.* The Court posed the question—"Has the practice act changed the law?"—and answered it in the negative:

> We think not. That act expressly provides that those sections which unite legal and equitable remedies in one form of action, and authorize the court to administer law or equity as the case may require, shall not affect ... *quo warranto,* or in the nature of *quo warranto.* ... The writ of *quo warranto,* or proceedings of that nature, must now, as heretofore, be resorted to in all cases to which it is applicable. A bill in chancery cannot be substituted for it.

9 A. at 32.

In more recent times, the exception of quo warranto from the merger of law and equity has been codified. Conn. Gen.Stat. § 52–1 codifies the Practice Act's provision

that all courts "vested with jurisdiction both at law and in equity" may "administer legal and equitable rights, and apply legal and equitable remedies ..." Conn. Gen. Stat. § 52–122 provides that section 52–1 "shall not affect ... proceedings in ... quo warranto ..."

Reverting to the case at bar, Briscoe's first prayer for relief in his counterclaims against Local 825 [Doc. 31] is that the Court "[e]njoin Local 825 from retaliating against him, by proceeding on the quo warranto action or otherwise." An injunction is a form of equitable relief. In *Reiter v. New York City Transit Authority,* 457 F.3d 224, 229 (2d Cir.2006), the Second Circuit noted that "equitable relief lies at the core of Title VII, which expressly provides for non-monetary relief such as 'reinstatement' and 'hiring.'" *Reiter* quotes this passage from *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975):

> the purpose of Title VII[is] to make persons whole for injuries suffered.... This is shown by the very fact that Congress took care to arm the Courts with full equitable powers. For it is the historic purpose of equity to secure complete justice ... Where federally protected rights have been invaded, it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.

457 F.3d at 229–30.

Briscoe surveys the Connecticut practice statutes and contends that "quo warranto proceedings have been excluded from the merger of law and equity in Connecticut and thus a state superior court cannot hear Briscoe's federal defenses or counterclaims." Brief opposing remand [Doc. 21], at 2. His argument continues: "Because quo warranto actions are actions at law, state procedure prohibits Briscoe from raising an equitable Title VII defense in

state court," brief, at 17, or stated somewhat differently: "Because of the state-court procedural limitations on quo warranto actions, the fact that Local 825 is bringing the action out of unlawful, retaliatory spite cannot, in state court, be raised as a defense." *Id.*, at 18. It follows, Briscoe's argument concludes, that in the state quo warranto action he is "denied or cannot enforce" his federal equitable right and remedy, thereby satisfying the second prong of the removal statute. That perceived inability is the basic premise of Briscoe's opposition to remand to the state court.

Counsel for Local 825 make something of a mixed response to Briscoe's perceived procedural limitations in the state court. The Union's reply brief began with the assertion that there was no authority "supporting [Briscoe's] assertion that Title VII and 42 U.S.C. § 1981 are 'defenses' to a lawsuit," and accordingly Briscoe's argument "that because he cannot raise" those federal statutes "as defenses to Local 825's *quo warranto* action, he will be denied his federal civil rights to equality, is wholly without merit." Brief [Doc. 23], at 2. That contention by Local 825, which seemed to deny Briscoe's right to mention the federal questions during the state quo warranto action, was seemingly rendered inoperative by counsel's opening comment during oral argument on the remand motion: "There is absolutely no reason at all why a state court judge could not entertain the claims contained within [Briscoe's] counterclaim," Tr. 11, upon which counsel expanded by saying:

> But what I don't see, respectfully, in Mr. Rosen's petition is anything about the second prong and any alleged failure on the part of the court, a state court, to enforce Michael Briscoe's rights. Perhaps the very right he's asserted in the counterclaim that's before the Court, respectfully, your Honor, I don't know

why a state court couldn't hear that claim.

Tr. 13. That submission by Local 825's able attorney, Ms. Cofrancesco, caused me to wonder at the hearing if a distinction was being made between what a state court quo warranto judge could *hear* about Briscoe's federal claims and what the state judge could *do* about them. This exchange between the Court and counsel then took place:

> THE COURT: [S]uppose that proof [on behalf of Local 825 in support of ousting Briscoe] is put in as the quo warranto action begins before the state court judge, and then the judge looks expectantly at defense counsel, and defense counsel gets up and starts to put in proof of a spiteful and retaliatory motive in bringing the quo warranto action, you have, or whoever is representing the Union at that quo warranto trial would make no objection to that? You'd let that proof come in and then argue about it. Is that so?

> MS. COFRANCESCO [counsel for Local 825, hereinafter "Counsel"]: Well, your Honor, obviously, I would need to defend it, but—

> THE COURT: Sure.

> COUNSEL: But while it's related as a counterclaim, it doesn't change the merits of my underlying claim. He holds that position in violation of the charter and the civil service rules and the collective bargaining agreement.

> Now, what the remedy might be on the counterclaim is up to Mr. Briscoe and his counsel; but it doesn't change the complexion of my underlying complaint.

> THE COURT: . . . Would it be your argument before the state court judge that even if Mr. Briscoe proved a retaliatory intent as he's charged in these

papers, that would not constitute a defense or a bar to the remedy of quo warranto? He's out of a job anyway?

COUNSEL: Yes, your Honor.

THE COURT: ... And I take it that's because, as various Connecticut judges have said, that what a quo warranto proceeding tests is whether or not a particular officeholder holds that office de jure. Lawyers like to lapse into Latin at every occasion, and that's an example, de jure, de facto and all that stuff. What it means is he has a clear legal right to the office.

COUNSEL: Yes, your Honor.

THE COURT: And he either does, in which case, the quo warranto action is lost, or he doesn't, in which case, the quo warranto action succeeds, and he's out of that position.

COUNSEL: Yes.

THE COURT: And is it your contention that whether or not the Union's motive in bringing the quo warranto action in the first place was noble or retaliatory and ignoble makes no difference? Is that what it comes down to?

COUNSEL: Yes, your Honor.

Tr. 16–19.

As the colloquy continued, I asked Ms. Cofrancesco to comment on what this federal court should do if remand was denied, a federal judge concludes after trial that "in the particular circumstances of the case [Mr. Briscoe] does not have a clear legal right to the office he presently holds," but the judge also concludes that "the Union's protestation of concern for the collective bargaining agreement was pretext, and the only reason they went after him [on] quo warranto at this time was to retaliate for prior conduct, which, let's assume, if you'll indulge me even further, was protected by federal civil rights statutes." Tr. 20. The Court having set

that hypothetical stage, this exchange then occurred:

THE COURT: It seems to me that if a plenary trial is held, and the judge reaches both of those conclusions, someone is still going to have to win, and someone is going to have to lose, by which I mean he either stays on the job or he doesn't. What do you think? ... [T]ell me what you think the results should be.

COUNSEL: Well, your Honor, I think it's separate remedies. There's a remedy on the complaint and then there's a remedy on the counterclaim.... And so if the remedy on the underlying complaint is that he held the office illegally, he's out of the job. On the counterclaim, again, I don't want to put myself in Mr. Rosen's shoes, but he would probably ask for some level of damages, punitive damages, and he would ask that his attorneys' fees be paid.... But certainly, your Honor, under these circumstances, the bench trial could be held in state court, and that would be the Union's position.... Because the issues raised in that counterclaim are not unique to this court. They can be equally heard down the street.

THE COURT: In the context of the quo warranto action, which the Union commenced; correct?

COUNSEL: Yes.

THE COURT: .... There's nothing that would prevent [Mr. Briscoe] from making those assertions and those claims in the state court quo warranto action?

COUNSEL: That's correct, your Honor.

Tr. 21–23.

On this particular procedural point, the difference between the parties is entirely clear. Mr. Smith, the equally able attorney who argued the case for Briscoe, said:

"[I]t's not that Mr. Briscoe asserts a right to be immune from any lawsuit; it's that he asserts a right to be immune from a retaliatory lawsuit." Tr. 49. Precisely because that is so, counsel submitted that the federal judge "would first decide whether or not the action is retaliatory, and if you determined it was retaliatory, that's the end," Tr. 48, an apocalyptic phrase by which counsel meant that this federal court, having removed Local 825's quo warranto action from state court and refused to remand it, would then dismiss that action with prejudice.[13]

The quoted colloquy between the Court and Local 825's counsel is useful. Its value lies in the incisiveness and clarity of counsel's remarks, not in the fact that the Court did most of the talking. One may deduce from these exchanges the position of the Union with respect to what would happen under Connecticut law in the Connecticut trial court if Local 825's quo warranto action is remanded to that court. I summarize that position in the following paragraph, bold faced for the sake of clarity:

**The state court judge would receive evidence on the question of whether Briscoe has a clear legal title to the City position he now holds. If Briscoe proves that he has such legal title, he will retain his position. If he fails in that proof, he will be ousted. The state court judge would also receive evidence from Briscoe, if submitted, on his counterclaim against the Union, purporting to show that the Union's motivation in filing that action was retaliatory and discriminatory. The judge may conclude that Briscoe proved his counterclaim of Union retaliation, but that conclusion would not affect Briscoe's quo warranto ouster from his position if he did not have clear legal title to it. Briscoe's remedy in the state court in such circumstances would be limited to such money damages as he may be able to prove under governing Connecticut law. The state court would not be in a position to grant Briscoe equitable relief, because it sits as a quo warranto court and the legislature excepted quo warranto actions from the merger of law and equity.**

This scenario is consistent with, if not mandated by, Connecticut case law. Briscoe says in his brief [Doc. 21] at 18 that to his knowledge, "no Connecticut court has ever addressed whether the specific equitable defenses Briscoe wishes to raise— Title VII and § 1981 retaliation—are procedurally proper in [a] quo warranto action." Local 825 does not cite such a case. The Court's research has not unearthed one. This Court could certify and refer the question to the Connecticut Supreme Court, but that process would be time consuming. Neither party suggests it. I think the decided Connecticut cases make the answer sufficiently clear. In the seminal 1879 case of *Hinckley v. Breen*, the Connecticut Supreme Court, in recognition of the legislature's enactments, excluded from quo warranto actions the procedures and forms of action available to courts sitting in equity.

More recently, in *Bartlett v. City of Rockville*, 150 Conn. 428, 190 A.2d 690 (1963), the Supreme Court rejected the effort by a demoted city police sergeant "to invoke the equity power of the court to restrain by injunction the action taken by the [city] council in demoting him." 150 Conn. at 430, 190 A.2d 690. The Court

13. Briscoe's Notice of Removal, Doc. 1, concludes with ¶ 23: "After removal, this Court should determine that the quo warranto action is retaliatory and violates Briscoe's federal rights and it should then dismiss the case."

held that "equity does not have jurisdiction to remove public officers or to restrain or relieve against proceedings for their removal." *Id.* The plaintiff had "an adequate remedy at law" in mandamus or quo warranto, "and equity therefore will not interfere." *Id.* (citing *Hinckley v. Breen,* 55 Conn. at 121, 9 A. 31).

In *Lopez v. Board of Education of the City of Bridgeport,* 310 Conn. 576, 81 A.3d 184 (2013), the Supreme Court said that "the writ of quo warranto developed and has continued as a limited and extraordinary remedy ... to test who the lawful public official is," 310 Conn. at 590, 81 A.3d 184, and held that "a quo warranto action may not be used to avoid the administrative process by mounting a collateral attack on a government agency's licensing or certification decision that has qualified a public officer to hold his or her position." *Id.* at 600, 81 A.3d 184.

The Connecticut Appellate Court has held that in a quo warranto action, "the sole issue is the defendant['s] right to hold office de jure, and the remedy on the failure of any defendant to carry the burden of proof is that defendant's ouster." *Demarest v. Fire Dept. of the City of Norwalk,* 76 Conn.App. 24, 34, 817 A.2d 1285, 1292 (Conn.App.2003).

In *State ex rel. Martin v. Pepin,* 14 Conn.Supp. 225, 1946 WL 710 (Conn.Super.1946), a quo warranto action seeking the ouster of a county commissioner, the Superior Court held that the incumbent defendant could not avail himself of the equitable defense of estoppel. The judge observed that "[t]he only purpose of the [quo warranto] action is to determine whether the defendant shall retain the office or be ousted from it," and held that "[i]nasmuch as the relator does not stand to gain anything for himself in such a proceeding, it is clear that no personal conduct of his ought to prevent the removal of another person from the office to which the latter is entitled." 1946 WL at *5.

In *O'Hanlon v. City of Danbury,* No. DBDCV–074008131S, 2010 WL 527987 (Conn.Super. Jan. 7, 2010), a quo warranto action involving the appointment of city firefighters, the Superior Court held that a defense based on the equitable doctrine of laches "fails because a quo warranto action cannot be waived by the passage of time due to the public's interest in the legality of its government officers." 2010 WL 527987, at *3.

I think it is clear from this line of Connecticut cases that Ms. Cofrancesco correctly predicted the future course of proceedings in the Connecticut Superior Court on the quo warranto action if Local 825's motion to remand is granted, a prediction summarized in the bold faced paragraph *supra.* Specifically: these and like decisions, obedient to the holding and rationale of the early *Hinckley v. Breen* decision, establish a rule that would preclude the state court from considering Local 825's retaliatory motive, even if proven, as a bar to Briscoe's ouster. It is not a sufficient answer to say, in support of removal, that Briscoe can retain his office by proving at the quo warranto trial that he has a clear legal title to it. Briscoe's federal Title VII claim is that he should not be required to defend a retaliatory action for his ouster *at all,* so that if Union retaliation is proved, the Union's quo warranto action is barred. I intimate no present view on whether Briscoe can prove that retaliation claim, or what remedy would be appropriate if he does. The core circumstance on this motion to remand is that Briscoe can assert that federal claim in this federal court as a bar to his ouster. He cannot assert that claim in the state

court as a bar to his ouster.[14]

The decisive question on Local 825's motion to remand thus becomes whether these circumstances demonstrate that Briscoe is "denied or cannot enforce" in the Connecticut courts his Title VII right to be free from retaliation and discrimination, in the wording of 28 U.S.C. § 1443(1), aptly described by Judge Friendly as "this venerable but Delphically worded statute." *New York v. Horelick,* 424 F.2d 697, 698 n. 1 (2d Cir.1970). The purpose of the second prong "deny or cannot enforce" requirement "is to give state courts the power and opportunity to correct alleged denials of a citizen's civil rights whenever possible, and thereby to avoid unnecessary federal interference with state judicial processes." 14C Wright, Miller & Cooper, *Federal Practice & Procedure* § 3727 (4th ed.).

The Supreme Court has construed the "deny or cannot enforce" formula in a series of decisions which include *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880), *Virginia v. Rives,* 100 U.S. 313, 25 L.Ed. 667 (1880), *Georgia v. Rachel,* 384 U.S. 780, 86 S.Ct. 1783, 16 L.Ed.2d 925 (1966), *City of Greenwood v. Peacock,* 384 U.S. 808, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966), and *Johnson v. Mississippi,* 421 U.S. 213, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975). These decisions, no doubt intended by the Court to resolve questions and uncertainties in a complex and sensitive area of the law, have given rise to a Legion of cases in which lower court federal judges try to determine which of two alternatives—removing a case from state court or remanding a case to state court—is consistent with Supreme Court authority. In this Circuit, we have the very considerable benefit of three analyses by Judge

Friendly of the removal statute and the Supreme Court's opinions construing it: *see,* in reverse chronological order, *New York v. Davis,* 411 F.2d 750 (2d Cir.1969); *New York v. Horelick,* 424 F.2d 697 (2d Cir.1970); and *Emigrant Sav. Bank v. Elan Mgmt. Corp.,* 668 F.2d 671 (2d Cir. 1982).

*Strauder* and *Rives* both involved criminal prosecutions of black defendants who were convicted after trials in state courts by all-white juries. The West Virginia statute in *Strauder* excluded Negroes from jury service. The Virginia statute in *Rives* imposed jury duty on *all* males within a certain age range. The Supreme Court held that removal should have been granted in *Strauder* but was properly denied in *Rives.* As Judge Friendly explained in *Emigrant:* "The *Strauder–Rives* line of distinction was that removal would lie when enforcement of the petitioner's rights in a state court was barred by a state statute or constitutional provision which was applicable in terms although unconstitutional on its face, but not when the allegation was simply that in practice he would be denied or unable to enforce his rights." 668 F.2d at 671.

The Court decided *Strauder* and *Rives* during the same term. It also decided *Rachel* and *Peacock* during the same term, 86 years after the earlier pair. *Rachel* and *Peacock* each involved state criminal prosecutions of black defendants. The Court granted conditional removal in *Rachel* and denied it in *Peacock.*

In *Rachel,* black individuals had been arrested when they sought to obtain service at privately owned restaurants open to the general public in Atlanta, Georgia. They had been told to leave by the restau-

---

14. One may note in passing that on this motion to remand, it is in Local 825's interest to maximize, not minimize, the degree to which

Briscoe can defend against the quo warranto action or counterclaim against the Union on the basis of his federal Title VII claims.

rant owners and refused to do so. The *Rachel* defendants were prosecuted under a Georgia statute which made it unlawful to refuse "to leave premises of another when ordered to do so by owner or person in charge." 384 U.S. at 783 n. 1, 86 S.Ct. 1783. Plaintiffs alleged that they were told to leave solely because of their race. Provisions of the Civil Rights Act "created a federal statutory right to service in a place of public accommodation free from any discrimination because of race and color," and had been construed by the Court in a prior case [15] "as prohibiting any state prosecution for asserting such a right." *Emigrant*, 668 F.2d at 674 (Friendly, *J.*) (analyzing Supreme Court decisions).

The Court held in *Rachel* that these circumstances would, if proven, justify removal under the "deny or cannot enforce" formula. Justice Stewart's opinion noted that in *Rives*, the Court had said "the denial of which the removal provision speaks 'is primarily, *if not exclusively*, a denial ... resulting from the Constitution or laws of the State ...'" *Rachel*, 384 U.S. at 804, 86 S.Ct. 1783 (quoting *Rives*, 100 U.S. at 319, 100 U.S. 313). From that language, Justice Stewart's opinion reasoned as follows:

> The Court thereby gave some indication that removal might be justified, even in the absence of a discriminatory state enactment, if an equivalent basis could be shown for an equally firm prediction that the defendant would be "denied or cannot enforce" the specified federal rights in the state court. Such a basis for prediction exists in the present case. In the narrow circumstances of this case, *any* proceedings in the courts of the State will constitute a denial of the rights conferred by the Civil Rights Act of 1964, as construed in *Hamm v. City of Rock Hill*, if the allegations of the

removal petition are true.... [I]f, as alleged in the present removal petition, the defendants were asked to leave solely for racial reasons, then the mere pendency of the prosecutions enables the federal court to make the clear prediction that the defendants will be "denied or cannot enforce in the courts of (the) State" the right to be free of any "attempt to punish" them for protected activity. It is no answer in these circumstances that the defendants might eventually prevail in the state court. The burden of having to defend the prosecutions is itself a denial of a right expressly conferred by the Civil Rights Act of 1964 as construed in *Hamm v. City of Rock Hill, supra.*

384 U.S. at 804–05, 86 S.Ct. 1783 (emphasis added and footnote omitted). The Supreme Court conditioned removal in *Rachel* by remanding the case for a hearing to establish whether the defendants "were ordered to leave the restaurant facilities solely for racial reasons. If the Federal District Court finds that allegation true, the defendants' right to removal under § 1443(1) will be clear." *Id.* at 805, 86 S.Ct. 1783 (footnote omitted).

While *Rachel*'s conception of "an equivalent basis" for an "equally firm prediction" of denial or inability to enforce has been regarded as an extension of the *Strauder–Rives* criteria for removal, it is a modest one. Judge Friendly said in *Emigrant*, 668 F.2d at 674: "The narrowness of the extension of *Strauder* made in *Rachel* was immediately demonstrated in *Peacock*," decided the same day in another opinion by Justice Stewart. *Peacock* denied removal to black defendants in state prosecutions who alleged that they were arrested for having engaged in protected civil rights activity, principally public protests

---

**15.** *See Hamm v. City of Rock Hill*, 379 U.S.   306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964).

against racial discrimination and segregation in Mississippi. As the Supreme Court explained *Peacock*'s holding in its subsequent decision in *Johnson v. Mississippi*, 421 U.S. 213, 95 S.Ct. 1591, 44 L.Ed.2d 121 (1975), the *Peacock* Court "assumed that the claimed statutory rights were within those rights contemplated by § 1443(1), but went on to hold that there had been no showing that petitioners would be denied or could not enforce their rights in the state courts." 421 U.S. at 221–22, 95 S.Ct. 1591. That attempted showing failed because "Petitioners could point to no federal law conferring on them the right to engage in the specific conduct with which they were charged; and there was no 'federal statutory right that no State should even attempt to prosecute them for their conduct.'" *Id.* at 222, 95 S.Ct. 1591 (quoting *Peacock*, 384 U.S. at 826, 86 S.Ct. 1800).

In *Emigrant* Judge Friendly, seeking to divine the Supreme Court's meaning in its several interpretations of the removal statute,[16] said this:

> Thus it seems clear that although the Court in *Rachel* and *Peacock* interpreted the permissible range of removal under § 1443(1) to be slightly broader than that indicated in *Strauder* and *Rives*, the scope of the intended expansion was limited to statutes containing explicit anti-prosecution language, as was the case with § 203(c) of the Civil Rights Act of 1964 in *Rachel*.

668 F.2d at 674–75 (footnote omitted).

The Second Circuit's decision in *Emigrant* itself is instructive in its illustration of the application of this line of Supreme Court cases to the circumstances of a particular case. Elan Management Corp., a residential real estate owner and manager, sought to remove under § 1443(1) an ac-

tion brought in a New York state court to foreclose a mortgage on a building owned and managed by Elan. Elan's theory justifying removal was that in purchasing and renovating a 45–apartment building, Elan had relied on the promise of Emigrant's predecessor bank to rewrite an existing mortgage on favorable terms. Emigrant then refused to issue a new mortgage, and ultimately filed a state court foreclosure action against the building. Elan alleged that Emigrant refused to issue a new mortgage because the majority of the building's tenants were non-white. Elan contended that this conduct on the bank's part violated a substantive provision of the federal Fair Housing Act found in 42 U.S.C. § 3605, of which Elan had complained, and that the foreclosure action was a retaliatory measure violative of another Fair Housing Act provision. Emigrant moved to remand its foreclosure action to the state court, arguing that "Elan had failed to demonstrate, as required by 28 U.S.C. § 1443(1), that the state court cannot fairly deal with the questions raised in Elan's defense." 668 F.2d at 673. The district court granted Emigrant's motion to remand. The Second Circuit affirmed.

Judge Friendly's opinion reviewed the line of cited Supreme Court cases and concluded that Elan's case did not fall within *Rachel*'s basis for removal. A crucial distinction between the facts in *Emigrant* and those in the case at bar has to do with a party's ability to present to a state court his claims or defenses arising out of a federal civil rights statute. On that question, the Second Circuit said this in *Emigrant*:

> If the mortgagors should plead a violation of [42 U.S.C.] § 3605 as a defense,

---

16. "[T]his venerable but Delphically worded statute," to repeat Judge Friendly's phrase in

*Horelick*, 424 F.2d at 698 n. 1.

nothing in New York's foreclosure statute or the practice under it would preclude a New York court from giving appropriate consideration to the plea.

A foreclosure action is equitable in its nature, even though the right to foreclosure is based on legal rights, and it is within the province of a court of equity to see to it that a party invoking its aid shall have dealt fairly before relief is given.... In particular, New York recognizes the "clean hands" requirement in foreclosure actions, under which courts will not assist a party when the right asserted is contrary to the public interest. New York's Human Rights Laws declare the State's policy against racially discriminatory practices in relation to credit. Since New York law does not permit infringement of any federal right Elan might possess, there is no basis for the prediction, as there was in *Strauder* and *Rachel,* that the state court would deny federal rights as a result of following state law.

668 F.2d at 675 (citations and footnotes omitted).

In stark contrast, one may predict with a confidence bordering on certainty that if the state court judge in the case at bar follows the Connecticut law of quo warranto, the judge will disregard Briscoe's federal rights, at least to the extent that Briscoe asserts Local 825's violations of those rights as an equitable bar entitling him to enjoin the Union's effort to oust him from his present office. That prediction is based upon the Connecticut statutes excluding quo warranto actions from the merger of law and equity, and upon the line of quo warranto decisions of Connecticut courts which, in response to those statutes, bar consideration of an office holder's *equitable* claims or defenses and confine

the action to a determination of the office holder's *legal* right to the position in question: a result which in practice reflects the principle declared by the statutes, that the merger of law and equity does not apply to quo warranto actions.

That is the course that counsel for Local 825 contends the state court should and would follow, and I think she is right. Briscoe claims that the retaliatory nature of the Union's quo warranto action against him violates his federal civil rights and requires dismissal of the quo warranto action without more. It is clear that Briscoe "cannot enforce" that claimed federal right in the Connecticut courts: In the quo warranto action before the Connecticut court, Briscoe will be ousted from his present City position if it is not his to occupy *de jure,* and it matters not whether Local 825's motive in seeking Briscoe's ouster by its quo warranto action was selfless and noble (as the Union contends) or ignoble mean-spirited retaliation for Briscoe's protected civil rights activities (as Briscoe contends). If Briscoe's claim of Union retaliation as a bar to his ouster is to be heard at all, it must be in this federal court. For the reasons stated, Briscoe cannot make or enforce that federal claim in the state court quo warranto action: an inability that satisfies the second prong of this § 1443(1) analysis.

■ The case at bar accordingly falls within the rationale for removal stated by Justice Stewart in *Rachel,* 384 U.S. at 800, 86 S.Ct. 1783, and quoted by Judge Friendly in *Emigrant,* 668 F.2d at 674: "Removal is warranted only if it can be predicted by reference to a law of general application that the defendant will be denied or cannot enforce the specified federal rights in the state courts." [17] In the light

17. The provision in 42 U.S.C. § 2000e–3(a), which prohibits a union from discriminating

against a union member who has been active in opposing or testifying about the conduct of

of the circumstances discussed *supra*, I conclude that Briscoe has shown each of those several elements. The case will remain in this Court. Local 825's motion to remand the case to the Connecticut Superior Court will be denied.

## V

### Conclusion

For the foregoing reasons, the Court makes the following Order:

1. Defendants' motion [Doc. 16] to remand this case to the Connecticut Superior Court, from which the case was removed, is DENIED on the present record.

2. The Court will conduct an evidentiary hearing for the purpose of determining whether Plaintiff Briscoe can prove the federal civil rights claims upon which he bases his prayer for injunctive relief. The prayer is addressed to the Court sitting in equity. The Court will hear the evidence and decide the issues without the participation of a jury. This hearing will be held in order to comply with the procedures described by the Supreme Court in *Rachel*, 384 U.S. at 805, 86 S.Ct. 1783.

3. If Plaintiff proves his federal civil rights claims or any of them, the Court will direct further submissions from counsel with respect to an appropriate remedy or remedies. If Plaintiff fails to prove a federal civil rights claim, the case will be remanded to the Connecticut Superior Court for trial of the quo warranto action.

4. There are circumstances and exigencies in the case which indicate that the hearing should be held with reasonable dispatch. The Court will be available to counsel beginning on **August 24, 2015** and will arrange its calendar to hear this case as soon as counsel can prepare for the

hearing. To that end, counsel are directed to confer with each other, with the mutual good will and professionalism they have displayed to date, and attempt to agree upon the date for the beginning of the hearing and the number of consecutive trial days necessary to complete it. Counsel must advise the Court as soon as agreement has been reached. If no hearing dates have been agreed upon by the end of August, the Court will select the dates and schedule the hearing to take place in September.

The foregoing is SO ORDERED.

others, is the functional equivalent of the federal civil rights statute prohibiting prosecution for seeking services that played a part in *Rachel*.